[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15794

_____

D.C. Docket No. 6:14-cv-01335-RBD-GJK

COMMODORES ENTERTAINMENT CORPORATION,

Plaintiff -
Counter Defendant -
Appellee,

versus

THOMAS MCCLARY,
FIFTH AVENUE ENTERTAINMENT, LLC,

Defendants -
Counter Claimants -
Third Party Plaintiffs -
Appellants,

DAVID FISH, et al.,

Third Party Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 9, 2018)

Before MARCUS, MARTIN, and NEWSOM, Circuit Judges.

MARCUS, Circuit Judge:

In this common-law trademark case, Thomas McClary appeals from an order granting judgment as a matter of law to Commodores Entertainment Corporation (CEC) and converting a preliminary injunction into a permanent one against McClary and his corporation, Fifth Avenue Entertainment, LLC. The dispute concerned ownership of the mark "The Commodores," the name of a famous Grammy Award–winning rhythm and blues, funk, and soul music band. McClary was an original member of The Commodores, but, by his own admission, he "split from the band" in 1984 to strike out on his own in the world of music. He later formed a musical group that performed as "The 2014 Commodores" and "The Commodores Featuring Thomas McClary." When CEC -- a corporation run by two original Commodores who remain active with the group -- found out about McClary's group, it filed this lawsuit against McClary and Fifth Avenue claiming trademark infringement, trademark dilution, passing off, false advertising, and unfair competition.

The district court granted CEC a preliminary injunction and enjoined McClary from using the marks; a panel of this Court affirmed. Then, after a two-week trial, the district court granted judgment as a matter of law to CEC and converted the preliminary injunction into a permanent one. McClary and Fifth

Avenue appeal that order, as well as the district court's oral ruling denying their motion to dismiss for failure to join an indispensable party.

After careful review, we hold we lack jurisdiction to review the denial of the motion to dismiss and that the district court did not abuse its discretion in excluding expert testimony from an attorney who proffered only legal conclusions. We also conclude that when McClary left the band, he left behind his common-law rights to the marks. Those rights remained with CEC. Moreover, we conclude that the scope of the injunction was not impermissibly broad, that McClary's arguments about the validity of the federal registration of the marks are irrelevant to this determination, and that McClary did not establish any affirmative defenses. Accordingly, we affirm.

## I.

## A.

The Commodores was formed in 1968. The group has released over forty albums, has charted seven number-one singles and numerous top-ten hits, and continues to record music and play for audiences around the world. The group's big break came in 1971, when it opened for the Jackson 5 on a world tour. Shortly after the tour, the group signed a recording contract with Motown Record Corporation. The group's first album, "Machine Gun," was released in 1974. Throughout the 1970s, The Commodores became internationally acclaimed with

3

hits including "Easy," "Brick House," "Three Times a Lady," and "Too Hot ta Trot."

Although three other individuals were also involved at the early stages of the group, the "original" members are generally regarded as William King, Ronald LaPread, Thomas McClary, Walter Orange, Lionel Richie, and Milan Williams.[1] On March 20, 1978, these six members, along with their manager, Benjamin "Benny" Ashburn, formed a general partnership governed by a General Partnership Agreement. The agreement included a section expressly addressing the use of the name "The Commodores" upon the withdrawal of a partner: "Upon the death or withdrawal of less than a majority of the Partners, the remaining majority of the Partners shall continue to have the right to use the name THE COMMODORES for any purpose." Each partner was permitted to withdraw at any time so long as he provided the group with six months' written notice; notably, one partner's withdrawal would not end the partnership. Two months later, the partners registered CEC as a Nevada corporation.

Around a year later, in 1979, CEC entered into an Exclusive Artist Production Agreement with Motown Record Corporation. This agreement also restricted use of the name: band members could perform as "sidemen" for other

---

[1] The group's first members were Andrew Callaghan, Michael Gilbert, Jimmy Johnson, William King, Thomas McClary, Lionel Richie, and Milan Williams. Sometime in 1968 or 1969, Walter Orange replaced Callaghan and Ronald LaPread replaced Gilbert. Johnson was fired from the group and was not replaced.

4

artists and groups, but "in no event" could they use the name "Commodores" in connection with that engagement. And the members and the group as a whole were, "joint and not severally, the sole and exclusive owner of all rights in and to the Name." Much like the General Partnership Agreement, this agreement provided that if a member withdrew from the group, neither he nor his heirs would have the right to make individual use of the name. In addition, if "one or more Members [became] a Leaving Member(s), then the Remaining Member(s) [would] automatically and without notice become (jointly and not severally) the sole and exclusive owner of the rights" to the name.

In 1982, Lionel Richie left the group to pursue his solo career; The Commodores continued without him and notified Motown of the change. CEC and Motown entered into a new agreement whereby CEC again "warrant[ed] and represent[ed] that it and [the signee] [were], jointly and not severally, the sole and exclusive owner of all rights in and to the Name" and that "its agreement with the Group provide[d] that no Leaving Member, nor heirs of any member have or will have the right to make any individual use of the Name." This agreement described "Leaving Members" as a member or members who "separate[d] from, and/or ceased to perform with, the remaining Member(s)."

Around the time that Richie left the group, Ashburn passed away. In March 1984, the remaining members of the group (King, LaPread, McClary, Orange, and

5

Williams) executed an "amendment in toto" to the General Partnership Agreement

that read this way, in part:

> The principal business activity of the Partnership no longer is to engage in the entertainment business as the Group but is to own, maintain and lease certain motor vehicles and musical and studio equipment to Commodores Entertainment Corporation, a Nevada corporation, (the "Corporation"), which now conducts the business of the Group, and to hold all rights in and to the Group name "THE COMMODORES," the logo thereof, and any service mark, trademark, service name, or tradename associated therewith, and all goodwill inherent therein (collectively referred to as the "Group Name").

Like the other contractual arrangements, this amendment also clarified the use of

the group's name: "Upon the death or withdrawal of less than a majority of the

Partners, the remaining majority of the Partners shall continue to have the right to

use the Group Name for any purpose."

Later in 1984, and by his own admission, McClary "split from the band" to

pursue his own solo career.  On August 6, 1984, McClary allegedly sent a letter

confirming his withdrawal from the band to King, LaPread, Orange, and Williams,

as well as to several lawyers affiliated with the group.  The letter was addressed to

Lawrence J. Blake, a lawyer who had done legal work for The Commodores.  It

read in full: "I hereby confirm my withdrawal from the Commodores Effective as

of May 31, 1984.  I have certainly enjoyed fourteen years of being with you guys

and I wish you the best."  The letter was on the letterhead of "Thomas McClary

Productions, Inc." and was marked with Blake's firm's "received" stamp, which

6

Blake later swore was part of the firm's procedure to indicate when documents were received.  However, McClary said that he had not seen the letter until the lawsuit began.  At the later trial, McClary presented a forensics expert who testified that it was "highly probable" that the signature on the letter was not McClary's.

Although the formalities of McClary's departure are contested, it is undisputed that McClary did not perform with The Commodores from 1985 through 2010.  Soon after McClary's departure, J.D. Nicholas joined the group.  In 1986, The Commodores received its only Grammy for the single "Nightshift." McClary had no part in that single and did not receive the Grammy with the group.

Over time, LaPread and Williams also departed from the group, leaving King and Orange as the only remaining original members.  At some point, King and Orange transferred their common-law trademark rights in The Commodores' name and logo to CEC.  In 2001, CEC registered four trademarks ("the marks" or "the Commodores marks") with the United States Patent and Trademark Office (PTO).  The trademarks were for the word mark "THE COMMODORES" and the word mark "COMMODORES" with a design.  They granted CEC exclusive rights to the marks for "[e]ntertainment services, namely live performances by a musical and vocal group," as well as for "[m]usical sound and video recordings, namely, pre-recorded audio cassettes, video tapes, compact discs of live and in-studio

7

musical performances."  For three of the marks, first use was listed as April 1, 1972; first use in commerce was on April 30, 1972.  For the fourth mark, first use was listed as December 31, 1968; first use in commerce was on the same day.  The marks were renewed in March 2010, and are still active and in use today.

In 2002, King, Nicholas, and Orange executed an amended and restated partnership agreement for a new partnership, Commodores New, LLP, so that Nicholas could also share in the partnership.  This agreement recounted that the partners had previously agreed to "transfer ownership of the trademark and/or service mark 'COMMODORES'" to CEC.

## B.

This lawsuit arose out of McClary's allegedly improper use of the marks.  After leaving the group in 1984, McClary signed a solo contract with Motown and released a solo album.  He eventually formed his own recording label and released another solo album in 2008.  Then, in 2009, McClary performed with Richie and LaPread at the Superdome in New Orleans.  McClary's wife sent an email advertising the show as a Commodores reunion, and David Fish, the manager of the original Commodores, received the email.  On June 8, 2009, CEC wrote to McClary declaring CEC's ownership of the name and stating that McClary had "no right to make any announcement about or use the name Commodores."  McClary never responded.

8

In 2010, McClary was asked to fill in as a guitar player when The Commodores' regular guitar player became ill. McClary appeared with The Commodores two or three times and signed autographs with The Commodores' members. McClary never appeared with the group on any other occasion. At no point did McClary ask to rejoin the group, and the group never offered him membership. In 2011, McClary hosted a "listening session" at his home in Orlando that several original members of the group attended. In planning the listening session, McClary thanked Fish for "bringing The Commodores to the table." This session was meant to be an opportunity to brainstorm and develop new songs, but ultimately The Commodores and McClary did not release any songs from this session.

Nothing further happened until 2013, when McClary formed the group "Commodores Featuring Thomas McClary." He and his wife also established Fifth Avenue Entertainment to conduct entertainment-oriented business; Fifth Avenue is the manager of "Commodores Featuring Thomas McClary." McClary's group began performing under the names "Commodores Featuring Thomas McClary" and "The 2014 Commodores," and he scheduled a performance at a New York venue on July 6, 2014. On June 5, 2014, King learned of this engagement when a friend called to ask about the performance, thinking that it was an official Commodores show. King and Orange realized that this was McClary's

band and, the same day, their manager contacted the executive director of the venue. The executive director said he thought he had booked the Grammy Award–winning Commodores -- not a tribute or cover band featuring a former member.

On June 10, CEC received a cease and desist letter from McClary's wife. She claimed that McClary's band name constituted fair use and asserted that CEC was interfering with McClary's ongoing business relationships. She demanded that CEC "cease and desist from contacting any venues that may book [her] client in the future and making similar unsubstantiated claims" regarding McClary's use of the marks.

C.

On August 19, 2014, CEC filed this action in the United States District Court for the Middle District of Florida claiming trademark infringement, trademark dilution, passing off, false advertising, and unfair competition. CEC also moved for a temporary restraining order or a preliminary injunction. McClary raised several counterclaims, alleging, among other things, intentional interference with present and prospective business relationships, trademark infringement, unfair competition, cancellation of a registered trademark, passing off, false advertising, misappropriation of likeness and identity, and defamation. McClary also claimed that CEC lacked standing, arguing that "Commodores Entertainment Corporation" is not a valid Nevada corporation because the Nevada corporation was registered

10

as "Commodores Entertainment Corp."   In addition, McClary asserted that the federal trademark registrations were invalid because they listed "Commodore Entertainment Corp." as the registrant rather than "Commodores Entertainment Corporation."

The district court granted CEC's motion for a preliminary injunction, enjoining McClary from "using any of the Marks at issue in a manner other than fair use, including performing under the name 'The Commodores featuring Thomas McClary' or 'The 2014 Commodores'" and concluding that CEC had shown a substantial likelihood of success on its claim of trademark infringement. After the injunction was entered, CEC learned that McClary and his band were advertising and marketing upcoming performances in the United Kingdom and Switzerland.  CEC asked the district court to clarify the extraterritorial reach of its preliminary injunction.  The trial court granted the motion and held that the injunction would have extraterritorial application because use of the marks overseas would have a substantial and negative impact on CEC, an American corporation.  A panel of this Court affirmed the entirety of the preliminary injunction, finding "no error as to the district court's determination that CEC established a substantial likelihood of success on the merits." Commodores Entm't Corp. v. McClary, 648 F. App'x 771, 777 (11th Cir. 2016) (per curiam).

11

In a series of pretrial motions, CEC moved to strike one of McClary's expert witnesses, lawyer Richard Wolfe, claiming that his testimony amounted to improper legal opinions and conclusions. The district court limited Wolfe's testimony, excluding "any legal conclusions or opinions concerning the law." At the close of discovery, both parties unsuccessfully moved for summary judgment. The district court bifurcated the trial of the case sua sponte. Phase I would determine only the "ownership rights to the service marks and trade name at issue"; then, "[i]f necessary, Phase II w[ould] concern outstanding issues of infringement, liability, and damages."

The trial began on July 25, 2016. After CEC rested, McClary unsuccessfully moved for judgment as a matter of law. McClary also unsuccessfully moved to dismiss the case for failure to join an indispensable party -- Ronald LaPread, an original member of The Commodores. McClary then presented his case, again offering the testimony of attorney Wolfe, but after reviewing Wolfe's expert report and taking testimony from Wolfe outside of the presence of the jury, the court excluded his testimony in its entirety. The defense rested on July 28, 2016, and its renewed motion for judgment as a matter of law was denied.

CEC also moved for judgment as a matter of law; the district court granted the motion and discharged the jury. The court said that the record was "uncontroverted that Mr. McClary left the group known as the Commodores in or

12

around 1984 to pursue a solo career"; that "Mr. McClary left behind all of his rights to the trademarks when he left the band in 1984"; and that "those rights remained with the group, including Mr. Orange and Mr. King." Later, the trial court issued a written order on the grant reiterating its conclusion that "no reasonable jury could conclude that: (1) Plaintiff <u>does not</u> own or have rights to the trademarks at issue; or (2) Mr. McClary <u>does</u> own or have rights to the trademarks." The district court observed that the "original members of 'The Commodores' acquired common law rights to the trademarks associated with the musical band once the band achieved public fame." However, McClary walked away from his rights to the marks when he left the band in 1984, and those rights remained with the group. Further, no reasonable juror could conclude that McClary had exercised any control over the quality and characteristics of the band since his departure. Finally, the court concluded that King and Orange made valid assignments of their ownership rights in the marks to CEC and that CEC now owns the rights to the marks. The district court also converted its preliminary injunction into a permanent one, again enjoining McClary from using the marks in any manner other than fair use, and entered final judgment for CEC.

McClary moved to certify the grant of judgment as a matter of law to CEC and the denial of its motion to dismiss for failure to join an indispensable party for immediate interlocutory appeal. The district court certified only the order granting

13

judgment as a matter of law to CEC.  The court's certification did not reference McClary's motion to dismiss.

McClary timely appealed from the district court's entry of judgment as a matter of law on the issue of trademark ownership, from the entry of a permanent injunction barring his use of the marks, and from the denial of his motion to dismiss for failure to include an indispensable party.

## II.

Before we address the merits of this appeal, two preliminary issues require our consideration: whether we have appellate jurisdiction over the orders on review and whether it was reversible error to exclude McClary's expert witness, attorney Richard Wolfe.  After reviewing this lengthy record, we are satisfied that we have jurisdiction over the district court's entry of judgment as a matter of law in favor of CEC and over the entry of a permanent injunction, but we conclude that we have no power to entertain, at this stage in the proceedings, the district court's order denying McClary's motion to dismiss for failure to join an indispensable party. We also conclude that the district court did not abuse its considerable discretion in excluding Wolfe's testimony.

## A.

We have jurisdiction to review only "final decisions of the district courts." 28 U.S.C. § 1291.  "A final decision is one which ends the litigation on the merits

14

and leaves nothing for the court to do but execute the judgment." CSX Transp., Inc. v. City of Garden City, 235 F.3d 1325, 1327 (11th Cir. 2000) (quotations omitted). Thus, an order that disposes of fewer than all of the claims against all of the parties is not immediately appealable unless the district court certifies the order as final pursuant to Fed. R. Civ. P. 54(b). Rule 54(b) provides that when an action presents more than one claim for relief or involves multiple parties, "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b); see also Supreme Fuels Trading FZE v. Sargeant, 689 F.3d 1244, 1246 (11th Cir. 2012). To determine whether an order is certifiable under Rule 54(b), a district court engages in a two-step process. First, the court must decide whether the order is both "final" and a "judgment." Lloyd Noland Found., Inc. v. Tenet Health Care Corp., 483 F.3d 773, 777 (11th Cir. 2007) (quotations omitted). Then, it must determine that there is "no just reason for delay" in permitting the parties to appeal its decision immediately. Id. (quotations omitted). The district court engaged in this inquiry, finding that its decision was "final" and that there was no reason for delay and ordering that its entry of judgment as a matter of law was a final judgment for purposes of Rule 54(b). Even if that was incorrect, a party may immediately appeal interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or

15

modify injunctions." 28 U.S.C. § 1292(a)(1). Thus, it is abundantly clear that we have jurisdiction under § 1292(a)(1) to review a district court's interlocutory order granting a permanent injunction. See Hillcrest Prop., LLC v. Pasco Cty., 754 F.3d 1279, 1280 (11th Cir. 2014).

Moreover, as for the order converting the preliminary injunction into a permanent one, appellate jurisdiction is likewise present. See Sec. and Exch. Comm'n v. First Fin. Grp. of Tex., 645 F.2d 429, 433 (5th Cir. Unit A May 1981).[2] Although the district court proceedings were designed to continue into a second phase for resolution of infringement, liability, and damages, the permanent injunction is plainly one "granting, continuing, modifying, refusing or dissolving" an injunction. 28 U.S.C. § 1292(a)(1).

The same cannot be said, however, of the trial court's order denying McClary's motion to dismiss for failure to join an indispensable party. We have previously observed that "the denial of a motion to dismiss is not a final order reviewable under 28 U.S.C. § 1291." Foy v. Schantz, Schatzman & Aaronson, P.A., 108 F.3d 1347, 1350 (11th Cir. 1997). However, "we may, within our discretion, exercise jurisdiction over otherwise nonappealable orders under the pendent appellate jurisdiction doctrine." Summit Med. Assocs., P.C. v. Pryor, 180

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

F.3d 1326, 1335 (11th Cir. 1999). "Pendent appellate jurisdiction is present when a nonappealable decision is 'inextricably intertwined' with the appealable decision or when 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" King v. Cessna Aircraft Co., 562 F.3d 1374, 1379 (11th Cir. 2009) (quoting Swint v. Chambers Cty. Comm'n, 514 U.S. 35, 51 (1995)). But, notably, pendent appellate jurisdiction does not exist "when resolution of the nonappealable issue [is] not necessary to resolve the appealable one." Id. at 1380; see also In re MDL-1824 Tri-State Water Rights Litig., 644 F.3d 1160, 1179 (11th Cir. 2011) ("[T]he critical inquiry is whether the appealable issue can be resolved without reaching the merits of the nonappealable issues."). Indeed, the Supreme Court has suggested that "pendent appellate jurisdiction should be present only under rare circumstances," so we will exercise this jurisdiction "in only limited factual scenarios." King, 562 F.3d at 1379–80 (citing Johnson v. Jones, 515 U.S. 304, 318 (1995)).

In his motion to dismiss, McClary claimed that Ronald LaPread was an indispensable party because LaPread was an original member of The Commodores who claimed partial ownership of the marks. However, the issue of joinder is not inextricably intertwined with the permanent injunction. In fact, the district court made no reference to LaPread; rather, it adjudicated CEC's and McClary's ownership rights in the marks. At no point did the trial court so much as address

17

whether LaPread had rights to the marks, whether he had withdrawn from the partnership, or whether he had abandoned his rights.  Nor did McClary present any evidence that LaPread had sought to use the marks; nor, finally, did he even suggest how LaPread's possible claim to ownership would affect the instant dispute between CEC and McClary.  Moreover, LaPread would not be precluded from suing in the future to determine any ownership rights he may have in the marks because, in Florida, both res judicata and collateral estoppel require an identity of the parties and LaPread is neither a party to nor in privity with any party to this suit.  See Marquardt v. State, 156 So. 3d 464, 481 (Fla. 2015); Fla. Bar v. Rodriguez, 959 So. 2d 150, 158 (Fla. 2007).  Thus, we decline to exercise pendent appellate jurisdiction over the motion to dismiss because it is not inextricably intertwined with the permanent injunction.

## B.

McClary also claims that the district court abused its discretion in excluding expert testimony from attorney Richard Wolfe.  At trial, McClary offered the testimony of Wolfe on the validity and value of the marks, the goodwill associated with the marks, the validity of the assignment to CEC, the difference between statutory and common-law trademarks, and whether CEC breached duties owed to its shareholders.  CEC moved to strike the witness because his testimony amounted to no more than improper legal conclusions.  The district court initially said Wolfe

18

could testify so long as he did not offer "any legal conclusions or opinions concerning the law," but after reviewing Wolfe's report and hearing his testimony outside the presence of the jury, it excluded the testimony entirely.

"We review for abuse of discretion the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion." United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc). Under this standard, "we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." Id. at 1259. Under Federal Rule of Evidence 702, a witness with particular "knowledge, skill, experience, training, or education" may offer opinion testimony if, inter alia, he is qualified to do so based on his "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702.

Here, CEC does not contest Wolfe's qualification as a legal expert. Rather, CEC says that Wolfe's testimony was properly excluded because he offered only legal conclusions. While it is well established that a qualified expert in a civil case may offer his opinion on an "ultimate issue" in a case, Fed. R. Evid. 704(a), experts "may not testify to the legal implications of conduct" or "tell the jury what result to reach." Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990). Rather, "the court must be the jury's only source of law," and questions of law are not subject to expert testimony. Id. "[C]ourts must remain

19

vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law." United States v. Milton, 555 F.2d 1198, 1203 (5th Cir. 1977). Thus, the district court must take "adequate steps to protect against the danger that [an] expert's opinion would be accepted as a legal conclusion." United States v. Herring, 955 F.2d 703, 709 (11th Cir. 1992).

Wolfe's expert report is replete with legal opinion. In it, he offered the legal view that the original members "owned the underlying marks jointly as tenants in common, owning an undivided interest in the totality of the partnership assets." He explained that McClary "was an equal owner, in an undivided interest in the name and had equal rights (as each of the other founding members had) to use and enjoy the mark, which right was not waived, nor divested"; that "McClary was not divested of his interest in the PARTNERSHIP nor his interest in the underlying trademark"; and that McClary "never executed an assignment or waiver of his ownership rights." He even wrote that "ownership of the trademark will be vested in those persons who created, used and controlled the creative endeavors of the group" and that "[i]n this case, that occurred in 1978, when there were five members of the band to be called 'the Commodores' including Thomas McClary." These legal conclusions were properly struck. The district court was the only source of the law, and Wolfe's testimony would have invaded the court's exclusive prerogative.

20

Wolfe's trial testimony, taken outside of the jury's presence, fares no better. On the stand, he said that "it's common in the industry that the owner of the name is the person or persons who create the signature sound"; that he would expect to see written agreements for any transfer of ownership rights to a group name; that a hiatus from a band is not enough to relinquish ownership in the band; and that "[t]here are multiple ways in which an owner of a mark can continue to participate and exploit that mark even though they may not be standing up on stage and performing." These statements, too, do no more than offer expert opinion in the form of legal conclusions, and they risked confusing, prejudicing, or misdirecting the jury.

McClary also claims that Wolfe offered opinions on music industry customs and norms and that these opinions were improperly excluded. But these opinions were not offered in his expert report, and he was therefore properly precluded from discussing these topics at trial. See Fed. R. Civ. P. 26(a)(2)(B)(i). Moreover, McClary's suggestion that Lawrence Blake, "also an attorney, was allowed to testify for CEC about his interpretations of the Parties' contracts provisions" is wholly unpersuasive. Notably, McClary does not challenge the district court's admission of Blake's testimony. And Blake was not called as an expert witness; rather, he was offered as a fact witness who testified about McClary's interactions with the group, the letter he received from McClary, and whether any group member had formally

21

voided his shares in the corporation. The district court's responsibility to serve as the singular source of law required it to be vigilant about the admissibility of legal conclusions from an expert witness. There was no abuse of discretion here.

III.

The purpose of a mark is to be identifiable as a unique entity -- to be knowable by a name. The Lanham Act describes that trademarks are used "to identify and distinguish [one's good from the goods of] others and to indicate the source of the goods." 15 U.S.C. § 1127. Marks are legally protected to avoid confusion between a legitimate good and one claiming to be that same good. In the context of this case, where both parties acknowledge that valid marks did and do exist in the name "The Commodores," the trademarks help to identify and distinguish the music of the ensemble known as "The Commodores."

To properly overturn the district court's grant of CEC's motion for judgment as a matter of law on the question of mark ownership, we would have to find a reasonable basis to say that McClary should have the rights to use the name "The Commodores" to identify and distinguish a musical ensemble. That is, a reasonable juror would have had grounds to believe that the marks could be used by McClary while performing individually and without the group that has continuously performed as "The Commodores." We can find no contested facts

22

that would lead a reasonable juror to say that McClary should properly be termed the legal owner of the trademarks.  Therefore, the district court's grant of judgment as a matter of law is due to be upheld.

McClary's core argument on appeal is that the district court erred in granting CEC's motion for entry of judgment as a matter of law.  The standard for granting the motion is a demanding one.  As the district court recognized, the motion may be granted only when the evidence is "overwhelmingly" in favor of one party's position.  "[A] court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'"  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)).  But "if substantial evidence exists in opposition to the motion such that reasonable people, exercising impartial judgment, might reach differing conclusions, then the motion should have been denied and the case submitted to the jury."  Williams v. Dresser Indus., Inc., 120 F.3d 1163, 1167 (11th Cir. 1997).

The district court also properly recognized that it could not "make credibility determinations or weigh the evidence."  Reeves, 530 U.S. at 150. Likewise, on appeal, we "review all of the evidence in the record" and "draw all reasonable inferences in favor of the nonmoving party" -- that is, McClary -- without making any credibility determinations or weighing evidence.  Id.

23

Therefore, we are required to "disregard all evidence favorable to the moving party" and "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached." Id. at 151 (quotations omitted).

Phase I of the trial addressed only the trademark ownership rights of CEC and McClary, and the district court's grant of judgment as a matter of law addressed those ownership rights. A trademark is "any word, name, symbol, or device, or any combination thereof" used by a person "to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. Section 43(a) of the Lanham Act, Pub. L. No. 79-489, 60 Stat. 427, 441 (1946), codified as amended at 15 U.S.C. § 1114, creates a federal cause of action for trademark infringement. "To establish a prima facie case of trademark infringement under § 43(a), a plaintiff must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." Tana v. Dantanna's, 611 F.3d 767, 773 (11th Cir. 2010) (quotations omitted).

McClary says that entry of judgment as a matter of law on the question of the trademark rights was improper. He claims that the district court erred by concluding that the right to use The Commodores marks was CEC's. His

24

argument is not persuasive. McClary's claim to rights in The Commodores marks fail for two independent but mutually reinforcing reasons. First, the common-law trademark rights were initially jointly owned, could not be divided for simultaneous use by multiple independent parties, and remained in the group continually known as "The Commodores." Second, the various contractual agreements executed by the parties confirm the group members contemplated that the marks were to be jointly but not severally owned and, in addition, that a member leaving the group would cease using the group's name as an identifier. In sum, no reasonable juror could have found that McClary retained a right to use the name "The Commodores" on his own and separately from the group that has continually used that same name.

A.

The essential question presented in the first phase of the trial was this: What happens to the ownership of a trademark in the name of a performing group when the group's membership has evolved with time? Our analysis starts with the common-law rights to the marks and the original ownership of those rights. While we have created a national system to register marks, common-law rights are not overridden by that registration system. See, e.g., Matal v. Tam, 137 S. Ct. 1744, 1752 (2017). Notably, a plaintiff need not have a registered trademark to use and enforce that mark. Rather, "the use of another's unregistered, i.e., common law,

25

trademark can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source." Tana, 611 F.3d at 773 (quotations omitted).

Common-law trademark rights are initially acquired through priority of appropriation. See, e.g., Columbia Mill Co. v. Alcorn, 150 U.S. 460, 463–64 (1893) ("[T]he exclusive right to the use of the mark or device claimed as a trade-mark is founded on priority of appropriation; that is to say, the claimant of the trade-mark must have been the first to use or employ the same on like articles of production."). To acquire common-law rights to a trademark, a party must have demonstrated prior use of the mark in commerce. See Crystal Entm't & Filmworks, Inc. v. Jurado, 643 F.3d 1313, 1321 (11th Cir. 2011) ("Common-law trademark rights are appropriated only through actual prior use in commerce." (quotations omitted)). Prior use, in turn, is established with "[e]vidence showing, first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." Id. (quotations omitted). We have concluded this association was present when "the distribution of the mark was widespread because the mark was accessible to anyone with access to the Internet"; when "the evidence established that members of the targeted public actually associated the

26

mark with the product to which it was affixed"; when "the mark served to identify the source of the product"; and when "other potential users of the mark had notice that the mark was in use in connection with the product." Id. (quotations and alterations omitted).

Common-law trademarks existed in the name "The Commodores," and the original owner of the marks was the group as a whole. In this case, there is no dispute that the marks were used in commerce, beginning with the early days of the group's performances and recordings as "The Commodores." The group was the first to appropriate that term and so acquired the exclusive rights to the trademark. The group began calling itself "The Commodores" sometime around 1969, and the public undoubtedly associated the mark with this famous musical group. The group performed as "The Commodores," released many records (including hits) as "The Commodores," and opened for the Jackson 5 as "The Commodores." Thus, there is no doubt that the group adopted the mark "The Commodores" as its own and that the public associated the mark with the group. Therefore, the original group had, at one point in time, common-law rights to the marks. McClary, as a member of the original group, was one of the holders of those rights.

i.

27

Ownership of the marks did not stay with McClary when he left the performing group. Rather, ownership of the marks began in, remained in, and could not be divided from the group, as opposed to its individual members.

For starters the uncontroverted record established that McClary left his position in the group known as "The Commodores" more than three decades ago. No reasonable juror could have found that McClary remained with the group in the position he had previously held. Indeed, over time, all of the original group members except for King and Orange left the performing group that continued to release music and to perform as "The Commodores." This included McClary: as he said repeatedly in his own pleadings and testimony and as was confirmed by many trial witnesses, he "split from the band" in 1984 to pursue a solo career.

Between 1985 and 2010, McClary had no interaction with the group as a member. He did not perform with the group, record with the group, or participate in any decisions about performances or recordings. He continued to draw royalties, but these were related to only the songs he wrote or recorded with The Commodores prior to his departure in 1984. The royalties were, in King's words, "money that you receive based upon your past performance as being in the group itself or music that you've written or co-written." Although McClary performed with the group in 2010 and hosted a listening session that King and Orange attended in order to encourage a reunion, these activities in no way suggest

28

continued involvement with the group. Nor do these activities bear any relationship to King's and Orange's continuing involvement with the group since 1968. It is undisputed that King and Orange are the only original members of "The Commodores" who have maintained continuity with the performing group since McClary's departure and that the group continued to perform as "The Commodores" in the years after 1985.

The next question, then, is what became of McClary's rights to the marks after he left the group and undeniably left the band. McClary claims that although the members who left had no involvement with the group, they still maintained common-law rights to use the group's name. We are unpersuaded. Instead, on this record, we determine that the common-law rights to the marks remained with the group members who continued to use and exert control over the group "The Commodores," and no reasonable juror could have found otherwise.

While we are not bound by the determinations of another circuit court, we find the reasoning of the Ninth Circuit to be persuasive, as the district court did. In Robi v. Reed, 173 F.3d 736 (9th Cir. 1999), a common-law trademark dispute, defendant Herb Reed founded the band The Platters in 1953 and plaintiff Paul Robi joined the group later; like in this case, the group jointly owned rights to the band name. Id. at 738–39. In 1965, Robi left the group and he never returned; Reed stayed on with The Platters. Id. at 738. In 1988, Robi assigned his purported

29

rights in the mark to his wife, Martha, who then began to manage an entirely new musical group also called "The Platters." Id.  Martha eventually sued Reed, who was still an active performer, asserting that she had exclusive rights to the name. Id.  In holding for Reed, the Ninth Circuit concluded that the rights to the name belonged to the members "who remain[ ] continuously involved with the group and [are] in a position to control the quality of its services." Id. at 740.  Reed "ha[d] been in a position to control the quality of its services"; among other things he was "the only surviving member of the five singers who originally began with the group," and was "the only member who ha[d] continuously performed with the group." Id.  In contrast, "Paul Robi left the group and never returned to it." Id.  The Ninth Circuit adopted the holdings of courts facing similar factual circumstances that determined that a member leaving a music group did not retain a right to use the group's name. Id. at 739–40 (citing HEC Enters., Ltd. v. Deep Purple, Inc., 213 U.S.P.Q. 991 (C.D. Cal. 1980); Kingsmen v. K-Tel Int'l Ltd., 557 F. Supp. 178 (S.D.N.Y. 1983); and Giammarese v. Delfino, 197 U.S.P.Q. 162 (N.D. Ill. 1977)).  Rather, when a member left the group, the "mark remained with the original group." Id. at 740.

Likewise, here the mark in "The Commodores" remained with the original group when McClary left.  The continuing members of the original group, including King and Orange, are still today in a position to control the group.  Given

30

the overwhelming evidence of the control others, including King and Orange, exerted over the performances and business decisions of The Commodores, no reasonable juror could find to the contrary. King and Orange decide how many shows the group will do in a year, and where and when they will perform; they determine the songs, costumes, and production details for their shows; and they are responsible for the group's sounds at those shows. They also make all personnel determinations, such as retaining crew members for performances.

While we are not bound by it, we agree with the panel of our Court that previously considered the facts on appeal of the preliminary injunction and found it significant that the remaining original members controlled the quality and reputation of the band performing as "The Commodores." Commodores Entm't Corp. v. McClary, 648 F. App'x 771 (11th Cir. 2016). We agree, given the control sustained by King and Orange, that the original members remaining with the group retained the common-law rights to the marks.

On the other hand, the unrefuted record can lead only to the reasonable conclusion that McClary lacked control over the musical venture known as "The Commodores" after he left the band to pursue his solo career. In the period after he left the band, save two performances as a fill-in guitarist in 2010, he did not meet with the other members of the group to rehearse or perform. He did not join the group to make business decisions about performance schedules or recordings.

31

He stopped writing songs with the group. He was not involved with the group's decisions about performances, whether about the songs to be performed, the personnel to be involved, or the production details of the shows. The rights to use the name "The Commodores" remained with the group after McClary departed, and the corollary is also true: McClary did not retain rights to use the marks individually.

The current ownership of the rights to use the marks does not address the possibility that McClary or another former member of the group could have, feasibly, regained rights to use the marks <u>with the group</u> if permitted to rejoin the group. Again, however, the uncontroverted record shows that this was not the case. While McClary attempts to draw legal significance from the two times he performed with The Commodores in 2010, there was no evidence offered to support the contention that he was being invited to rejoin the group as a permanent or otherwise ongoing member; instead he performed "with The Commodores." Indeed, the evidence showed that on two occasions McClary performed as a fill-in guitarist when the group's regular guitar player was out. Likewise, while the listening sessions McClary hosted were undertaken with some hope of a possible reunion or collaboration, no such reincorporation of McClary into the band occurred, and no reasonable juror could conclude otherwise. Even if the evidence could support a finding that McClary rejoined the group -- and in no way does it

32

afford that inference -- it could not support the conclusion that McClary should be able to use the group's name while performing separately from the group.

ii.

As the district court did, we find that the alternative framework of <u>Crystal Entm't & Filmworks, Inc. v. Jurado</u>, 643 F.3d 1313 (11th Cir. 2011), is not the framework applicable here but nonetheless would yield a similar result.  There, a panel of this Court addressed how to determine the ownership of trademark rights where there was no clear prior appropriation by either of the two parties to the case.  <u>Id.</u> at 1322.  The district court had determined, and this Court upheld its finding, that an entertainment company had not proven its predecessor in interest had established common-law trademark rights to the name of a musical group as originally constituted.  <u>Id.</u> at 1321.  Instead, the courts were tasked with determining the proper rights-holders as between the assignee of the original management company and the three performers who replaced the original members of the group.  <u>Id.</u>  We followed the district court in adopting a test drawn from <u>Bell v. Streetwise Records, Ltd.</u>, 640 F. Supp. 575 (D. Mass. 1986), whereby a court seeking to allocate rights between claimants who could not prove original appropriation of the trademark rights would look to see, first, the "quality or characteristic for which the group is known by the public" and, second, "who

33

controls that quality or characteristic." Jurado, 643 F.3d at 1322 (quoting Bell, 640 F. Supp. at 581).

We also agree that Jurado is not the case currently before us. Here, the parties do not dispute that the common-law trademark in "The Commodores" was originally appropriated by the group. However, we agree that even the Jurado framework does not alter the analysis. As for Jurado's first prong, The Commodores are distinguished by their music, including their recordings and performances. Under the second prong, as discussed above, no reasonable juror could find that McClary was the party who currently controls the music of The Commodores; instead, the original members continuing with the group have continuously exerted control over its music and performances. The unrefuted evidence can support only a finding that the original and ongoing group, including King and Orange, has exerted complete control over the current iteration of "The Commodores," to the exclusion of others, in particular McClary.

### iii.

The other alleged complications McClary asserts do not support a finding that he is the rightful owner of the marks. McClary claims that the district court's order granting judgment as a matter of law must be overturned for various reasons. These include assertions that McClary did not withdraw from The Commodores partnership, that he did not abandon his rights to the marks, that he retained rights

34

because he continued to receive royalties during the period after he left the group, and that CEC never acquired rights in the marks. No reasonable juror could conclude that McClary retained any rights in the marks from any of this.

To buoy his claims to a continuing interest in the marks, McClary says that he never officially withdrew from the partnership, that he did not follow the procedural requirements to officially withdraw pursuant to the General Partnership Agreement and the amendment in toto, and that the letter in which he allegedly stated that he was withdrawing is a forgery.[3] Although a factual question may remain as to both whether McClary formally left the partnership and whether the letter is a forgery, these issues have no bearing on McClary's individual common-law trademark rights and were not considered in the district court's order. Indeed, precisely because there were factual issues surrounding the validity of the letter, the district court was required to disregard this evidence. See Reeves, 530 U.S. at 151 ("[A]lthough the [district] court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."). McClary's compliance with the withdrawal procedures and the veracity of his letter have no bearing on whether he asserted control over the quality and

---

[3] McClary called a forensic document examiner, Richard Orsini, as a witness to testify regarding the letter. Orsini said that, based on examples of McClary's signature on other documents, it was "highly probable" that the signature on the letter was not written by McClary.

35

characteristics of the group or on whether he had continuing involvement with the group's services.

McClary argues that there was "highly conflicting evidence of whether McClary even 'left' the band in 1984," citing his claim that he never withdrew from The Commodores, the Partnership, or CEC. Even assuming, arguendo, that the evidence could present a question of whether McClary left the band, the evidence could not lead a reasonable jury to conclude that McClary somehow gained the right to use the marks by himself.

Neither does an assertion that McClary has not "abandoned" his rights to the marks help his contention. Abandonment leads to the loss of marks that are otherwise owned. See, e.g., Citibank, N.A. v. Citibanc Grp., Inc., 724 F.2d 1540, 1545 (11th Cir. 1984). Abandonment is relevant where an infringing user seeks to assert that an owner of a mark has given up those rights. If a mark has been abandoned (in the legal sense), it can then be lawfully used by another person. That is, the trademark principle of abandonment could be useful here only if McClary could argue, as a defense, that CEC has abandoned the marks. He does not; instead he argues that his failure to abandon is relevant to showing he retained some rights to the mark. This is not the case. Our conclusions about the relevance of McClary leaving the band have nothing to do with whether or not he abandoned his rights to the marks in question. We need not determine today whether or not

36

McClary at some time abandoned his ownership of the marks.  Instead, we determine that he does not have the rights to use the marks but that the marks are otherwise valid.

Moreover, collecting royalties does not show that McClary retained rights to the marks.  While McClary is correct that receipt of royalties can sometimes be enough to show continuing involvement with a group, his collection of royalties lends the opposite conclusion.  The unrefuted record shows that McClary only collected royalties for the songs he wrote with the band before his departure.  The cases McClary cites for the relevance of royalties all involved groups that had entirely disbanded and were later involved in trademark disputes with outside entities who were not original members of the groups.  See, e.g., Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc., 736 F.3d 1239, 1247–48 (9th Cir. 2013); Marshak v. Treadwell, 240 F.3d 184, 199 (3d Cir. 2001); Stetson v. Howard D. Wolf & Assocs., 955 F.2d 847, 850–52 (2d Cir. 1992); Kingsmen v. K-Tel Int'l Ltd., 557 F. Supp. 178, 182–83 (S.D.N.Y. 1983).  In those cases, the fact that the members of the defunct bands continued to receive royalties was enough to avoid finding that they had abandoned their rights to their band names.  McClary is not similarly situated to those original members because, in this case, original members did continue to use the marks after McClary's departure.

37

If anything, the collection of royalties supports the contention that McClary once had rights in the marks but did not retain those rights. The record showed that McClary collected royalties for the period when he was an active and performing member of The Commodores. Notably, he did not receive royalties for the music the band released over many years after his departure. No reasonable juror could conclude that collecting royalties for the music he co-wrote before his departure from the band constitutes a current right to use the marks over and above the band that has continued to be known as "The Commodores."

Finally, the record shows that King's and Orange's rights became CEC's rights by way of assignment. Although there is no evidence of a written assignment, King and Orange both repeatedly testified that they transferred their common-law rights to CEC. The preamble to the Amended and Restated Partnership Agreement of Commodores New, LLP, the partnership formed by King, Nicholas, and Orange, also states that the partners had previously agreed to "transfer ownership of the trademark and/or service mark 'COMMODORES' to Commodore Entertainment Corporation, a Nevada Corporation (the 'Corporation'), subject to the Partnership's continuing non-exclusive right to use that mark in connection with its business." As the continuing members who exerted control over the group, King and Orange owned the marks; CEC stepped into King's and Orange's shoes by virtue of the assignment. See Carnival Brand

38

Seafood Co. v. Carnival Brands, Inc., 187 F.3d 1307, 1310, 1315 (11th Cir. 1999).

McClary introduced no evidence to the contrary. Thus, the district court did not

err in granting judgment as a matter of law to CEC on the issue of trademark

ownership.

B.

McClary's claim fails for a second independent, but consistent, reason.

Reviewing the terms of the various agreements, the contracts establish that leaving

the group meant leaving behind any rights to the group's name. When McClary

left the band to pursue his own career, the contractual agreements contemplated

that he would give up his rights to use the marks. No reasonable jury could find

that, to the contrary, the contracts contemplated McClary would retain the right to

use the marks when he left the band. This contractual basis reinforces the

ownership of the common-law rights, which remained in the group continuing to

perform as "The Commodores" and only with the group.

The group's contracts plainly established that the group and its members

owned the marks jointly, not severally. In the 1979 Exclusive Artist Production

Agreement with Motown, each member unambiguously warranted that he and The

Commodores were, "joint and not severally, the sole and exclusive owner of all

rights in and to the Name." This provision was repeated in the 1983 Motown

agreement executed after Lionel Richie left the group. The 1984 "amendment in

39

toto" to the General Partnership Agreement explicitly said that the partnership "hold[s] all rights in and to the Group name 'THE COMMODORES,' the logo thereof, and any service mark, trademark, service name, or tradename associated therewith."  Again, it too made clear that if a partner withdrew from the group, "the remaining majority of the Partners shall continue to have the right to use the Group Name for any purpose."  In short, these provisions overwhelmingly established that the partners owned the name jointly, not severally, so long as they were part of the group.  The various agreements contemplated that a leaving member would not have the ability to use the name individually.  Thus, for example, the 1979 Motown agreement states that "no Leaving Member . . . will have the right to make any individual use of the [band name]."

The parties dispute whether McClary formally withdrew from the partnership.  However, even if we assume McClary never formally left the partnership, none of the agreements grant McClary the right to use the marks in connection with his own musical performances.  Nothing in the various agreements executed by the group affirmatively gives a member of the group or the partnership -- even a current member -- the right to use the name "The Commodores" in connection with an individual undertaking separate from the group that has, since its inception, performed as "The Commodores."  The 1978 General Partnership Agreement states that "No individual Partner or combination of Partners may

40

render any performance or services . . . utilizing the [Commodores marks] . . . without the written consent of all the Partners." However, even assuming there is a contested issue as to whether McClary formally withdrew from the partnership and that, if he were a partner, his written consent would have been required under that agreement for some uses of the group's name, the "amendment in toto" removed that provision.

As CEC notes, as the district court emphasized, and as we reinforce now, nothing about the current ownership of the marks is meant to diminish the contribution of McClary or the other founding members of The Commodores to the musical creations and goodwill surrounding the ensemble of that name. An individual can continue to be a Commodore -- a member of the original group -- without having the legal right to call himself "The Commodores." As Lionel Richie noted in his deposition, he considered he would "always be a Commodore," but when he considered if he "identif[ied] with being in the group now," the answer was that he did not. Similarly, as Orange put it in his testimony, McClary "is not the Commodores, the majority, with the original." The facts of this and similar disputes are reminiscent of the difficult trademark cases where courts have found an individual cannot use his or her own name for commercial purposes. In Conagra, Inc. v. Singleton, 743 F.2d 1508, we held that a successor-in-interest to a father's shrimping-related business held the exclusive rights to a common-law

41

trademark and could maintain a claim of infringement against the son attempting to use his own surname in a shrimping-related business. Id. at 1518; see also, e.g., Taylor Wine Co. v. Bully Hill Vineyards, Inc., 569 F.2d 731 (2d Cir. 1978) (holding that, where a wine-making partnership sold its assets to a corporation named Taylor Wine Company, the grandson could not use his family name in connection with labelling and advertising his own wine products). While an individual might identify with a name, he still might not have the right to use that name to identify himself in commerce.

## IV.

McClary raises four additional arguments, none of which displace the holding of the district court. He argues that the district court erred in denying his motion to dismiss for failure to join an indispensable party -- an issue that we are without jurisdiction to address. Second, he renews his claim that the permanent injunction is overbroad. Third, he suggests that CEC's federal registration of the marks was defective. Finally, he argues that CEC did not overcome the other affirmative defenses that he pled.

## A.

McClary raises two claims regarding the scope of the permanent injunction. First, he says that the injunction is overbroad because it prevents him from "hold[ing] himself and his music out to the public in an historically accurate way."

42

This claim is easily resolved: CEC and its officers have repeatedly stated that they do not object to McClary billing himself as "Thomas McClary, founder of The Commodores" and that "McClary is free to make fair use of the Commodore Marks to provide historically accurate information about his tenure as a Commodore." They agree that this name constitutes fair use and does not fall within the scope of the injunction. They do object, however, to names like "The 2014 Commodores" or "The Commodores featuring Thomas McClary," because these names are likely to cause confusion since King, Orange, and Nicholas continue to perform as The Commodores. But the injunction plainly allows McClary to use historically accurate names. As the district court clearly said, McClary "could either perform under a different band name without causing any confusion, or, to uphold his notoriety as a Commodore, he could make fair use of the Marks." Thus, this argument is moot.

For the first time at oral argument, counsel for McClary suggested that the Court explicate the meaning of fair use in this context in order to provide "further guidance and clarification." Counsel essentially asked the Court to enumerate which uses would be appropriate and which would fall into a forbidden zone. We are not in the business of providing what amount to advisory opinions, and this would be one. See, e.g., Golden v. Zwickler, 394 U.S. 103, 108 (1969). Additional uses of the marks have not been called into question, so any dispute about additional uses

43

has not ripened for review.  We repeat, as the district court said and both parties agreed, that McClary is free to make fair use of the marks and to use historically accurate names.

McClary's second claim is that the injunction is overbroad because of its extraterritorial reach.  The scope of the injunction was first discussed after King and Orange learned that "The Commodores Featuring Thomas McClary" was scheduled to perform in the United Kingdom and in Switzerland.  The district court granted their motion for clarification and concluded that the injunction had extraterritorial reach.  A panel of this Court affirmed, noting that the parties are citizens of the United States, that McClary's booking agent operates from the United States, that "customer confusion was not limited to the United Kingdom and Switzerland . . . but was also present in the United States," that the marks were not registered in a foreign country, and that "use of the marks extraterritorially w[ould] have an effect on CEC, a United States corporation."  Commodores, 648 F. App'x at 778.  We agree with this determination, even if we are not bound by it, inasmuch as our first opinion addressed only the wisdom and efficacy of a preliminary injunction and today we are called upon to address a permanent injunction.

As the Supreme Court has long said, "Congress in prescribing standards of conduct for American citizens may project the impact of its laws beyond the

44

territorial boundaries of the United States." Steele v. Bulova Watch Co., 344 U.S. 280, 282 (1952). It is also well established that "Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some of the acts are done outside the territorial limits of the United States." Id. at 286 (quotations omitted). In Steele, Bulova Watch Company sued an American citizen who conducted a business in Mexico City that sold watches with the name "Bulova" stamped on them. Id. at 281. Bulova requested injunctive and monetary relief based on asserted violations of United States trademark laws, and the Supreme Court ruled in its favor. Id. at 281, 286–87. We have considered three factors when determining the extraterritorial reach of the Lanham Act: (1) whether the defendant is a United States corporation, (2) whether "the foreign activity had substantial effects in the United States," and (3) whether "exercising jurisdiction would not interfere with the sovereignty of another nation." Int'l Café, S.A.L. v. Hard Rock Café Int'l (U.S.A.), Inc., 252 F.3d 1274, 1278 (11th Cir. 2001) (discussing Steele, 344 U.S. 280).

In this case, it is undisputed that both parties are citizens of the United States. And given the actual confusion that was experienced in the United States in connection with the New York performance, it is likely that McClary's use of the marks abroad would create confusion both abroad and in the United States. McClary's group is also managed in the United States by an American citizen, and

45

his use of the marks affects CEC, an American corporation, both at home and abroad.

As for the final factor, interference with another nation's sovereignty, the question is closer but McClary comes up short.  McClary notes that his corporation, Fifth Avenue, filed for a Community Trademark (CTM) in the European Union (EU) -- the equivalent of a federally registered trademark in the United States.  But McClary has offered no evidence that a CTM has been granted or issued by the Office of Harmonization in the Internal Market (OHIM), the EU's equivalent of the PTO.[4]  Rather, he notes that the OHIM denied CEC's opposition to Fifth Avenue's CTM application.  However, a CTM will be granted only if there is no opposition or if the "opposition has been rejected by a definitive decision." European Council Reg. No. 207/2009, Art. 45.  CEC appealed the denial of its opposition, so the opposition has not yet been "rejected by a definitive decision." Indeed, the EU Intellectual Property Office's database shows that Fifth Avenue's CTM status is "Application Opposed," indicating that a CTM has not yet been issued.  There is no record evidence that Fifth Avenue actually holds a CTM and,

---

[4] To receive a CTM, an application must be filed with the Office of Harmonization in the Internal Market, which examines the application to look for errors and similar marks. European Council Reg. No. 207/2009, Arts. 25, 36–39.  If the application is approved, it is published for public review; third parties then have three months to oppose the mark.  Id. at Arts. 36–42.  If there is opposition, the parties can resolve their dispute in an adversarial proceeding in front of the OHIM, which includes a right to appeal.  Id. at Arts. 58–60.

correspondingly, no evidence that the extraterritorial reach of the injunction infringes on a foreign nation's sovereignty.

### B.

McClary next claims that the federal registrations of the marks were fraudulent and defective. But these issues have no impact on whether CEC or McClary owns common-law trademark rights to the marks. CEC has common-law ownership of the marks independent of any federal registration. But even if we considered these federal trademark questions, McClary's claims would fail.

McClary's claims of fraud are belied by the record. In the trademark context, "[f]raud occurs when an applicant knowingly makes false, material representations of fact in connection with an application for a registered mark." Angel Flight of Ga., Inc. v. Angel Flight Am., Inc., 522 F.3d 1200, 1209 (11th Cir. 2008). "The party seeking to cancel a mark bears the burden of proving the alleged fraud by clear and convincing evidence." Id. Here, McClary is the party seeking to cancel the marks. However, he has not pointed to or introduced any evidence, let alone clear and convincing evidence, that CEC knowingly made false representations of fact. While fraud is a question of fact, on this record no reasonable jury could have found for McClary given the complete absence of evidence of any knowledge of fraud on CEC's, King's, or Orange's parts and in the face of King's uncontroverted testimony that he did not submit any false or

47

incorrect information to the PTO. Thus, even if they were relevant to this common-law trademark dispute, McClary's fraud claims still would fail.

McClary next says the registrations were defective because the marks were registered to "Commodore Entertainment Corp." rather than "Commodores Entertainment Corp.," and the former did not exist at the time the registrations were filed. Commodores Entertainment Corp., the appellee, was incorporated in Nevada on May 30, 1978, listing King and Orange as its officers. Commodore Entertainment Corp. was incorporated in Nevada in May 2015 by McClary, after this litigation ensued. Notably, McClary does not argue that his corporation, Commodore Entertainment Corp., owns the marks -- he merely says that the mistake is reason enough to cancel the mark. But as the PTO has said, a mistake in the registration is not enough to cancel a mark if the mistake amounts to "merely a misidentification of the proper name of the applicant in the original application." U.S. Pioneer Electrs. Corp. v. Evans Mktg., Inc., 183 U.S.P.Q. 613, 614 (P.T.O. Oct. 16, 1974). The mistake in this case is "merely a misidentification." As we said in reviewing the preliminary injunction, "it seems nonsensical that a typographical error on a trademark registration application would invalidate a federal registration of a trademark, especially where the district court has found that the party holding the registration of the mark has the substantive common law right." Commodores, 648 F. App'x at 776.

48

McClary also claims that the registrations were defective because the stated dates of first use and first use in commerce[5] -- either April 1972 or December 1968, depending on the mark -- predate CEC's creation in 1978, and that this discrepancy creates a factual question as to "whether CEC knowingly made false representations and intended to deceive the USPTO."  However, even if this was an error, "[a] misstatement of the date of first use in the application is not fatal to the securing of a valid registration as long as there has been valid use of the mark prior to the filing date."  Angel Flight, 522 F.3d at 1210 (quotations omitted).  It is undisputed that the marks have been in use since at least 1971, when The Commodores first opened for Jackson 5, and their use has spanned more than four decades.  King and Orange transferred their rights to CEC, and they undoubtedly had common-law rights to the marks on the stated dates of first use.  And under the Lanham Act, the terms "applicant" and "registrant" also include "the legal representatives, predecessors, successors and assigns of such applicant or registrant," which includes CEC as the assignee of King's and Orange's rights.  15 U.S.C. § 1127 (emphasis added).  Because CEC stepped into King's and Orange's shoes, the fact that the stated date of first use predates CEC's incorporation is of no

---

[5] A federal trademark registration must list the date of the mark's first use in commerce because "[t]he party who first uses a mark in commerce is said to have priority over other users."  Hana Fin., Inc. v. Hana Bank, 135 S. Ct. 907, 909 (2015).  Thus, "[r]ights in a trademark are determined by the date of the mark's first use in commerce."  Id.

moment to the validity of the federal trademark registration, let alone to the common-law trademark rights at issue.

## C.

Finally, McClary claims that the district court erred by granting judgment as a matter of law to CEC without making findings on McClary's laches and waiver affirmative defenses. We have said that "a defendant must demonstrate the presence of three elements in order to successfully assert laches as a defense: (1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." Kason Indus., Inc. v. Component Hardware Grp., Inc., 120 F.3d 1199, 1203 (11th Cir. 1997). While the Lanham Act does not contain a statute of limitations, in trademark cases we have "applie[d] the period for analogous state law claims as the touchstone for laches." Id. In Florida, this is four years. Fla. Stat. § 95.11(3), (6).

McClary says he has been using the marks with CEC's knowledge since 1984, but he has offered no facts or details about any use between 1984 and 2010, a period of twenty-five years. CEC's first notice of McClary's use came in May 2009, when McClary's wife sent a blast email advertising a Commodores reunion. CEC promptly sent a cease-and-desist letter to which McClary never responded. Then, in 2013, McClary formed his group "The 2014 Commodores" or "The Commodores Featuring Thomas McClary." Upon learning of this group and the

anticipated New York performance in June 2014, CEC promptly filed suit two months later. Moreover, McClary has not offered any explanation of how he was prejudiced by this delay. The district court did not err in passing on McClary's laches defense.

As for waiver, we have previously noted that "'waiver' has no trademark roots." SunAmerica Corp. v. Sun Life Assurance Co. of Can., 77 F.3d 1325, 1344 n.7 (11th Cir. 1996). Moreover, McClary makes no argument on appeal about waiver beyond saying that "judgment as a matter of law on McClary and Fifth Avenue's laches and waiver affirmative defenses was also error." He has not presented any facts surrounding waiver and has not provided any specificity about what may have been waived or how. If we are to assume that his waiver defense is based on the same facts as set forth in support of his laches defense, there is similarly no reason to conclude that CEC waived its ability to protect its marks. CEC acted promptly once it found out about McClary's new group, and there was no undue delay that prejudiced McClary in any way.

Accordingly, we affirm the district court's grant of judgment as a matter of law for CEC, affirm the entry of a permanent injunction, and decline to address the district court's order denying McClary's motion to dismiss for failure to join an indispensable party.

**AFFIRMED.**

51