[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 19-11487 and 19-11940

_____

D.C. Docket No. 2:15-cv-00952-SGC

SHAUN J YOUNGER,

Plaintiff-Appellee,

versus

EXPERIAN INFORMATION SOLUTIONS, INC.

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(June 19, 2020)

Before WILLIAM PRYOR, Chief Judge, and GRANT, Circuit Judge, and JUNG,[*]
District Judge.

JUNG, District Judge:

Appellant Experian Information Solutions, Inc. ("Experian") brings several

issues on appeal from a two-day jury trial in which Experian was found to have

_____

*The Honorable William F. Jung, District Judge for the Middle District of Florida, sitting
by designation.

negligently and willfully violated the Fair Credit Reporting Act. With the benefit of the parties' briefing and oral argument, we find no competent proof at trial of a willful violation, vacate the magistrate judge's final judgment in that regard, and remand for further proceedings. The remaining issues on appeal are affirmed.

## I. BACKGROUND

Plaintiff Shaun Younger brought this lawsuit on June 5, 2015 against defendant Experian and others. Experian is a credit reporting agency ("CRA") regulated by the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et. seq.* ("FCRA"). After other defendants and claims were resolved, Younger's remaining case against Experian claimed that Experian negligently and willfully violated 15 U.S.C. § 1681i(a)(1)(A) when it did not reinvestigate an item on his credit report that Younger asserted was in error.

The facts show that a prior small-claims debt of Younger's was resolved by a dismissal with prejudice of the debt claim on January 12, 2015, in state district court in Younger's home county in Alabama. Younger ran his credit report on March 30, 2015, with the assistance of his lawyer and they noticed that this debt was still being reported on his Experian credit report. Younger and his counsel drafted a letter to Experian and posted it from the lawyer's office that day. The letter attached the order of dismissal with prejudice and asked Experian to

reinvestigate the debt listing and remove it. The letter was typed in the lawyer's office by Younger and his counsel. Younger identified himself in the letter by name, date of birth, address, and last four digits of social security number. He provided information that could be used to verify the dismissal of the debt lawsuit. In the letter, Younger stated an incorrect account number when describing the debt. He also mistakenly asked Experian in the letter to correct his Equifax credit report, apparently because he and his lawyer also sent a similar letter to the Equifax credit agency. The lawyer sent the letter from the lawyer's local office via certified mail, but it had Younger's local return address on it. The envelope was typed and apparently bar coded by an automatic postal machine with printed postage. It did not bear a stamp or postmark.

Experian received Younger's letter on April 7, 2015. An unknown person in the Experian mail room concluded that the letter qualified for diversion under Experian's "suspicious mail policy" and diverted the letter. Precisely why this sorter in the mailroom determined Younger's letter qualified under the suspicious mail policy is unknown because Experian does not maintain a system tracking which employee marked a letter suspicious or why an employee marked a letter suspicious. On April 15, 2015, Experian sent to Younger at his home address the standard letter it sends to queries that are diverted by the suspicious mail policy. This letter stated:

Dear SHAUN J YOUNGER

We received a suspicious request in the mail regarding your personal credit report and determined that it was not sent by you. Suspicious requests are reviewed by Experian security personnel who work regularly with law enforcement officials and regulatory agencies to identify fraudulent and deceptive correspondence purporting to originate from consumers.

In an effort to safeguard your personal credit information from fraud, we will not be initiating any disputes based on the suspicious correspondence. Experian will apply this same policy to any future suspicious requests that we receive regarding your personal credit information, but we will not send additional notices to you of suspicious correspondence.

If you believe that information in your personal credit report is inaccurate or incomplete, please call us at 1 (855) 435-9429 to speak directly to an Experian consumer assistance representative.

Experian did nothing further with Younger's request, and so it did not reinvestigate within 30 days of receiving his letter. *See* 15 U.S.C § 1681i(a)(1)(A). Younger did not phone Experian as suggested in the letter, although his decision not to call Experian did not affect Experian's duty to reinvestigate, which attached when it received his request. *See id.* Instead, he filed suit against Experian on June 5, 2015. On June 10, 2015, pursuant to a communication from the debt holder, Experian deleted from Younger's credit file and report the information about which Younger had complained. Very shortly thereafter, Younger served Experian in this lawsuit.

4

The parties stipulated to dispositive jurisdiction before the United States Magistrate Judge under 28 U.S.C. § 636(c).  Prior to trial, the magistrate judge denied Experian's motion for summary judgment, but granted Younger's summary judgment motion in part.  The magistrate judge found that Experian violated its duty to reinvestigate Younger's disputed credit data.  In other words, the court held Experian was negligent in not following through with Younger's letter and reinvestigating the disputed entry.  Based on the magistrate judge's ruling, Younger would still have to prove causation and damages at trial on the negligence claim, but the court found a breach of the statutory duty to reinvestigate under 15 U.S.C. § 1681i(a)(1)(A).  The court held "no reasonable factfinder could find the March 30 letter's contents presented anything to suggest it was not 'from' Plaintiff."  "This [letter] triggered Experian's duty to conduct a reinvestigation, which Experian failed to do."

One week prior to trial Experian moved *in limine* to preclude mention, comment, or reference to any other settlements Experian may have executed, whether in lawsuits or administrative actions.  Younger filed no response to this motion although he was instructed to do so.  The magistrate judge granted the motion.  The court held "[s]uch evidence is irrelevant to the instant action and prejudicial for the purposes of Rule 403.  Even if such evidence has some

probative value, it would likely confuse and mislead the jury from evaluating [Younger's] claims in this case."

In this very short trial the parties selected a jury and rested by 11:00 am the second morning. During trial, only Younger and Experian's corporate representative testified. Our review of this short trial is hampered by the failure to report or otherwise contemporaneously record the eight mid-trial sidebar conferences, most of which appear to have discussed substantive case issues and objections. Off-the-record sidebars or bench conferences concerning case-related substance in a jury trial are not proper. 28 U.S.C. § 753(b); *see also United States v. Smith*, 591 F.2d 1105, 1108–09 (5th Cir. 1979).[1]

At trial, Younger moved into evidence Experian's suspicious mail policy. The policy states that a sorter is to evaluate each piece of mail for certain "listed" characteristics that might suggest a letter is not from the consumer. For example, "suspicious" characteristics include envelopes that are "similar" in type or size; envelopes that contain "similar" ink color or font; letters with a "similar letter format"; "hand addressed envelopes" with "a typed letter"; and "[u]nique handwriting." Other suspicious characteristics include "[a] signature found on [an]

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

attachment" that differs from "the signature on the letter"; "[d]ata on an attachment document [that] appears to have been manipulated"; "[d]ata on an attachment document [that] does not appear logical"; a "return address [on the letter itself] which differs from the return address appearing on the envelope";  and "[a] series of envelop[e]s where the postmark is in the same city but the return address[es] are in different cities."  When five or more letters from different consumers in a batch of mail contain the same listed characteristic, the policy counsels that a sorter can "reasonabl[y] . . . conclude that the[y] . . . may not have been mailed by the consumer" and mark them suspicious.

Younger twice cross-examined Experian's corporate representative, once during his own case-in-chief and once during Experian's case-in-chief.  Younger elicited testimony from the representative that established Experian misclassified his letter, the misclassifying of his letter occurred pursuant to Experian's suspicious mail policy, and that Experian agreed his letter contained no characteristics raising suspicion.  Indeed, although the representative could not identify any suspicious characteristic of Younger's letter at trial, she maintained that the letter was marked suspicious and not reinvestigated "pursuant to Experian's policies and procedures."  She explained that Experian receives "anywhere from 3,000 to 10,000 pieces of mail every day" but employs only 10 to 14 sorters to review the mail for suspicious characteristics.  She testified that

thousands of letters are marked suspicious each day, and suspicious letters are not reinvestigated without further action by the consumer even though the duty to reinvestigate attaches when the consumer reporting agency receives the letter and nothing in the FCRA requires a consumer to take additional action. 15 U.S.C. § 1681i(a)(1)(A).  Although the corporate representative agreed Experian's policy has led it to misclassify other letters besides Younger's, neither party presented any evidence of how often Experian misclassifies genuine consumer-dispute letters.

Younger also questioned the representative about a previous settlement agreement Experian had executed, contrary to the *in limine* order.  As described, the court's *in limine* order precluded any mention or use of Experian's legal or administrative settlements. Younger asked the representative if an ulterior purpose for the suspicious mail policy is to induce the consumer to phone Experian, so Experian can sell or market to him during a dispute call.  The representative denied that the dispute agents tried to sell things.  At this point, Younger showed the representative a settlement agreement between several state attorneys general and several credit reporting agencies, including Experian.  Basically, the settlement agreement imposed "best practices" by agreement.  Titled "Assurance of Voluntary Compliance/Assurance of Voluntary Discontinuance," the settlement agreement contained all the formal caveats that it contained no admissions by the CRAs, no findings of fact or law, and no liability found or admitted by the CRAs; indeed it

contained a denial of liability by the CRAs.  The settlement agreement did mention the states' "concerns" that the CRAs were violating the FCRA and stated that the states had investigated various topics including whether the CRAs "engage in improper disclosure or marketing practices relating to the sale of direct-to-consumer products to consumers during credit report dispute phone calls." Younger asked a 12-line speaking question to the representative, which inaccurately stated that the settlement agreement contained,

> [a]s a result of the findings of this multistate committee, according to this document that your lawyer and Experian signed—or your lawyer's law firm, rather—it says that y'all shall adopt a script for use in post-dispute marketing phone calls to communicate to consumers in a clear and comprehensible language when the dispute portion ends and when the marketing products and services begins.

The representative then twice denied that Experian marketed to consumers who called into the dedicated consumer dispute phone line.  Younger responded, "Well, then, based on your own personal knowledge, is it surprising to you that Experian agreed that they would enter into this compliance order and change their business practices to make it clear that they were marketing?"  At this point the defense counsel objected on relevance.  Neither party reminded the magistrate judge of the *in limine* order, and the court overruled the relevance objection.  After this ruling, Younger then repeated the question for seven lines, again premised on whether the representative would be "surprise[d]" and repeating the insinuation that the settlement agreement showed "that Experian would enter into this

assurance of voluntary compliance agreeing that they would not—or they would delineate and stop marketing to people at the same time . . . ?" The representative answered "no." Although Younger stated before the jury "we'll show the jury [the document] in a minute," he never offered the exhibit or marked it for identification.

In its examination of its representative, Experian asked about the benefits of the suspicious mail policy. Its representative testified that Experian considers it "really important to . . . protect the consumer's privacy." When Experian completes a reinvestigation, it must send the consumer "the results of the reinvestigation" and "a full personal credit report," which contains "a lot of information," such as

> phone numbers, addresses that [a consumer] live[s] at now, addresses [a consumer] used to live at, [a consumer's] employment information, all of the different banks that [a consumer] do[es] business with, credit card companies, partial account numbers, the phone numbers and addresses to those companies, anybody that's looked at your credit report in the last two years.

*See id.* §§ 1681a(d) (defining "consumer report"), 1681i(a)(6)(B)(ii) (requiring a credit reporting agency to provide "a consumer report" to the consumer upon completion of the reinvestigation). Because "potential fraudsters could use [this kind of information] to do bad things," Experian attempts to "protect" the consumer's privacy by ensuring "the consumer initiated the dispute." So Experian created the suspicious mail policy both "to comply with the FCRA" and "to add that extra layer of protection for the consumer."

10

During closing arguments, Younger stressed both that Experian created an overbroad policy to screen consumer disputes and that Experian created the policy to increase its revenue. As to the latter point, Younger again mentioned the settlement agreement. And Experian again objected, but this time it cited the *in limine* order. The magistrate judge overruled the objection because she concluded Experian had waived this ground by not asserting it when Younger first elicited the testimony on the settlement agreement. In its rebuttal, Experian told the jury that this settlement agreement had nothing to do with the suspicious mail policy.

The jury returned a verdict on the trial's second afternoon, finding that Experian's negligent failure to reinvestigate had caused harm to Younger, awarding $5,000 in compensatory damages. The jury further found Experian's violation of the FCRA was willful and assessed $3 million in punitive damages.

Experian brought post-trial motions for a new trial on all jury findings, based upon Younger's use of the settlement agreement. Experian also sought judgments as a matter of law for failure of proof on willfulness and on compensatory injury, and sought a vacatur or remittitur of punitive damages. The magistrate judge denied these post-trial motions[2] except to remit the punitive damages amount to $490,000 based upon due process principles.

---

[2] There were other post-trial motions made that are not relevant to this appeal.

On appeal, Experian seeks a judgment as a matter of law upon the willfulness claim, asserting there was an insufficient evidentiary basis. Experian seeks a similar remedy on Younger's $5,000 compensable damages verdict, arguing that Younger omitted sufficient proof of personal injury. Also, Experian seeks a new trial on both the compensatory and remitted punitive damages verdicts based upon Younger's use of the settlement agreement stratagem at trial. Finally, Experian seeks to have the $490,000 punitive damage award vacated for being constitutionally excessive.

## II. STANDARD OF REVIEW

A district court's denial of a defendant's motion for judgment as a matter of law is reviewed *de novo,* applying the same legal standard as the district court. *See Bianchi v. Roadway Express, Inc.*, 441 F.3d 1278, 1282 (11th Cir. 2006). Judgment as a matter of law should be granted when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1130 (11th Cir. 2018) (internal quotation marks omitted). This review draws "all reasonable inferences most favorable to the party opposed to the motion." *Simon v. Shearson Lehman Bros., Inc.*, 895 F.2d 1304, 1310 (11th Cir. 1990) (internal quotation marks omitted).

12

We review the district court's denial of a motion for new trial for abuse of discretion. *Bianchi*, 441 F.3d at 1282. "A judge should grant a motion for a new trial when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (internal quotation marks omitted). "Because it is critical that a judge does not merely substitute his judgment for that of the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

The statutory reinvestigation procedure for CRAs provides in relevant part:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

15 U.S.C. § 1681i(a)(1)(A). The CRA must promptly notify the data furnisher of any disputed information, and the CRA's notice to the furnisher must include "all relevant information regarding the dispute" that the CRA has received from the

13

consumer. *Id.* § 1681i(a)(2). In conducting the reinvestigation, the CRA "shall review and consider all relevant information submitted by the consumer . . . with respect to [such] information." *Id.* § 1681i(a)(4). Information in a consumer's file which is found to be inaccurate must be "promptly" deleted or modified, and the CRA must notify the furnisher of the information. *Id.* § 1681i(a)(5). A CRA may cease reinvestigating if it determines the consumer's dispute is "frivolous or irrelevant," including by reason of the consumer's failure to provide sufficient information to investigate the disputed information. *Id.* § 1681i(a)(3)(A). However, the CRA must notify the consumer within five (5) days if it determines the dispute is frivolous or irrelevant and terminates the reinvestigation. *Id.* § 1681i(a)(3)(B).

Within five (5) days after completing the reinvestigation, the CRA must provide the consumer with notice of the results and the consumer's rights relating to those results. *Id.* § 1681i(a)(6). In addition to providing the consumer the results of the reinvestigation, the CRA "shall provide . . . a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation." *Id.* § 1681i(a)(6)(B)(ii). But the furnishing of consumer reports is heavily regulated under the FCRA. Section 1681b provides a narrow set of circumstances for when a CRA "may furnish a consumer report," including "[i]n accordance with the written instructions of the consumer to whom it relates." *Id* § 1681b(a)(2). In

14

accordance with this restriction, the FCRA in turn imposes a duty on the CRA to "maintain reasonable procedures designed . . . to limit the furnishing of consumer reports to the purposes listed under section 1681b of this title." *Id.* § 1681e(a) ("These procedures shall require that prospective users of the information identify themselves . . . . No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a [section 1681b] purpose").

"The FCRA creates a private right of action against [CRAs] for the negligent, *see* 15 U.S.C. § 1681o, or willful, *see* 15 U.S.C. § 1681n, violation of any duty imposed under the statute." *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir. 2015). A negligent violation permits actual damages and attorneys' fees. *Id.*; 15 U.S.C. § 1681o. In order to recover for a negligent violation, a plaintiff must show actual damages. *Collins*, 775 F.3d at 1335. Actual damages may include mental distress, even in the absence of out-of-pocket expenses or physical injury. *Levine v. World Fin. Network Nat'l Bank (Levine I)*, 437 F.3d 1118, 1124–25 (11th Cir. 2006); *see also Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *Thompson v. San Antonio Retail Merchs. Ass'n*, 682 F.2d 509, 513 (5th Cir. 1982).

Where the violation is willful, the FCRA provides for statutory damages of $100 - $1,000 per violation, attorneys' fees, costs, and other forms of relief,

15

including punitive damages.  15 U.S.C. § 1681n.  Under *Safeco Ins. Co. v.  Burr*, 551 U.S. 47 (2007), the "willfulness" standard set forth in § 1681n encompasses not only "knowing" violations of the statute but also those committed in "reckless disregard" of the statute's requirements.  *Id.* at 57.  In other words, a "reckless disregard of a requirement of [the] FCRA would qualify as a willful violation within the meaning of § 1681n(a)."  *Collins*, 775 F.3d at 1336 (quoting *Safeco*, 551 U.S. at 71).  A company's action is a willful violation if it "shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  *Id.* (internal quotation marks omitted).  That is, a company acts recklessly when its "'conduct . . . entail[s] an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"  *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1303 (11th Cir. 2019) (quoting *Safeco*, 551 U.S. at 68).

A company violates the FCRA where its action, based on a reading of the statute's terms, is more than "merely careless" and, instead, it engages in conduct which amounts to an "objectively unreasonable" view of the company's duties under the statute.  *Safeco*, 551 U.S. at 69.  In *Safeco*, the defendant's policy stemmed from a reading of the FCRA that was flawed but "ha[d] a foundation in the statutory text" and, thus, was not objectively unreasonable.  *Id.* at 69–70 (explaining that a reading that is not objectively unreasonable "falls well short of

16

raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability").

After drawing "all reasonable inferences" in Younger's favor, *Simon*, 895 F.2d at 1310, (internal quotation marks omitted), we conclude that there is an insufficient evidentiary basis to support the verdict, *Commodores Entm't*, 879 F.3d at 1130. Although Experian's corporate representative admitted that, in addition to misclassifying Younger's dispute letter, Experian has misclassified other genuine letters under its policy, nothing in the record suggests that Experian does so often enough for a jury to permissibly infer that Experian ran an "unjustifiably high risk" of violating its duty to reinvestigate. *Safeco*, 551 U.S. at 68 (internal quotation marks omitted).  Younger offered no evidence of a broad or systemic problem with Experian's suspicious mail policy.  That the policy contains some broad characteristics, that Experian employs few persons to sort a large volume of mail, and that Experian has misclassified an unknown number of letters cannot, on their own, establish by clear and convincing evidence that Experian ran an unjustifiably high risk of violating its duties under the FCRA, especially in the light of another duty imposed by the FCRA. *See* Eleventh Circuit Pattern Jury Instructions (Civil Cases) 1.2 (2018) ("[C]lear and convincing evidence . . . is a higher standard of

17

proof than proof by a preponderance of the evidence.  It means the evidence must persuade you that the claim or defense is highly probable or reasonably certain."). [3]

The FCRA imposes an additional duty on Experian to adopt reasonable procedures to guard against the furnishing of a consumer report for an impermissible purpose.  *See* 15 U.S.C. §§ 1681b(a), 1681e(a); *see also Levine v. World Fin. Network Nat'l Bank (Levine II)*, 554 F.3d 1314, 1317–18 (11th Cir. 2009).  And, in conjunction with its duty to reinvestigate disputes that originate "directly" with the consumer, *id.* § 1681i(a)(1)(A), Experian must provide the consumer "a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation." *Id.* § 1681i(a)(6)(B)(ii).  Experian's policy allows it to sort out claims that do not appear to come "directly" from consumers.  With these considerations in mind, we cannot say that Younger provided sufficient evidence to establish that Experian recklessly disregarded the reinvestigation duty.  *See Safeco*, 551 U.S. at 69–70 (concluding Safeco did not act unreasonably when its actions "ha[d] a foundation in the statutory text"); *see also Levine II*, 554 F.3d at 1317–19 (evaluating whether Experian willfully violated its duty to ensure consumer reports were not furnished for an impermissible purpose).  Experian's actions had a foundation in the statutory text, even if the application of

---

[3] Before trial the parties agreed that the standard to establish willfulness was clear and convincing evidence and the jury was so instructed.  This appeal does not present any issues related to the appropriate burden of proof.

its policy was negligent as applied to Younger. *Safeco*, 551 U.S. at 69–70; *accord Collins*, 775 F.3d at 1336 (CRA "[t]aking no steps other than contacting only [a furnisher of data with a form] regarding the disputed entry might have been negligent, but willfulness or recklessness is a higher standard that has not been met in this case."). Thus, Experian's conduct was not willful within the meaning of § 1681n(a).

The verdict of willfulness cannot stand on this record. The magistrate judge should have granted Experian's Rule 50 motions for judgment as a matter of law at trial, or upon Experian's post-trial motion. The magistrate judge on remand shall enter judgment for Experian on the willfulness claim, pursuant to Fed. R. Civ. P. 50(e). This eliminates the remitted punitive damages judgment, as punitive damages are only available for willful violations. 15 U.S.C. § 1681n(a)(2). Our ruling will likely require the magistrate judge to revisit the attorneys' fees award upon remand.

We now turn to Experian's other grounds on appeal. Experian next contends that Younger's use of the settlement agreement was improper and requires a new trial on the negligence claim. Younger argues that defense counsel did not preserve this error by sufficient contemporaneous objections. Based upon our ordering a judgment as a matter of law on the willfulness claim, we deny this point on appeal. Considering all matters in a light favoring the verdict, even assuming

19

that contemporaneous objections sufficiently preserved this point, we do not believe that the trial stratagem using this settlement agreement contributed materially to the $5,000 personal injury judgment for negligence or rendered it suspect. As noted, the magistrate judge entered summary judgment for Younger, finding that the breach element of Younger's negligence claim was not a contested issue of fact and directing the jury that Experian breached its duty to reinvestigate upon receipt of Younger's letter. Experian does not contest this ruling on appeal.

Experian further asserts concerning the negligence claim that Younger's compensatory damages case failed for indefiniteness. Experian argues that the negligence claim failed at trial because damages as to pain and suffering were generalized and illusory; thus judgment as a matter of law is appropriate on this claim. Experian argues that Younger's proof of actual injury causation for mental distress and pain was insufficient to support the $5,000 jury award to him for these damages.

Although this is a closer call, we conclude that the admitted evidence supports Younger's relatively modest damages verdict. A plaintiff asserting claims for negligent compliance with the FCRA must show actual damages. 15 U.S.C. § 1681o; *see Levine*, 437 F.3d at 1123. At trial, Younger testified that a previous spinal surgery left him with permanent nerve damage, which caused severe pain when he got upset or stressed. He testified that Experian's refusal to acknowledge

20

his complaint, and the letter they sent him, exacerbated his preexisting injuries by generating additional stress which caused loss of sleep and greater nerve pain.  He testified as to definite, albeit impalpable, injuries directly caused by Experian.

To consider the jury's outcome in this regard we look to how they were instructed, under the agreed-upon jury instructions.  The instructions required Younger to prove damages proximately flowing from Experian's negligent noncompliance.  The instructions informed the jury that present damages for mental anguish, emotional distress, and pain and suffering were recoverable both for past injury and prospectively.  The court instructed the jury that:

> If any item of damage is of a continuing nature, you must decide how long it may continue.  You must decide which, if any, of these items of damage has been proved by Mr. Younger based upon the evidence and not upon speculation, guess, or conjecture.  The amount of money to be awarded for certain of these items of damages such as mental anguish cannot be proved in a precise dollar amount.  That law leaves such amounts to your sound judgment.
>
> Actual damages under the Fair Credit Reporting Act can include recovery for physical injury, personal humiliation, embarrassment, mental anguish, and emotional distress.
> . . .
> Damages for mental anguish and emotional distress are not presumed to have occurred.
> . . .
> In order to be recoverable, the emotional distress must be significant, that is, beyond generalized stress, and must be proximately caused by the defendant's conduct that violated the act, that is, Experian's failure to reinvestigate.

On these agreed-upon jury instructions, we think the jury could rationally have credited Younger's testimony and found that he proved more than generalized stress caused by Experian's negligent handling of his dispute and its mistaken letter to him.

## IV. CONCLUSION

The proof of a willful violation under 15 U.S.C. § 1681n was plainly not established by clear and convincing evidence at trial.  We vacate the magistrate judge's final judgment in this regard, and remand to that court for entry of judgment under Fed. R. Civ. P. 50(e) for Experian on Younger's willfulness claim. We affirm the magistrate judge's final judgment as to the Younger's negligence claim.

**VACATED IN PART AND AFFIRMED IN PART AND REMANDED.**