[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10614

_____

KEVIN JULMIST, et al,

Plaintiffs-Appellants,

*versus*

PRIME INSURANCE CO., et al,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-01416-SCJ

_____

Before JORDAN, NEWSOM, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

On February 19, 2013, Dr. Nedra Dodds performed a surgical liposuction procedure on April Jenkins at CJL Healthcare, LLC (the Clinic) in Georgia. Jenkins died that same day. Four months after her death, on June 20, 2013 at the same clinic, Dr. Dodds performed a surgical liposuction procedure on Erica Beaubrun, who died that night.

Initially, two lawsuits resulted from those two deaths. On August 5, 2013, Hal Jenkins, who is April's father and the administrator of her estate, filed a lawsuit in Georgia state court against the Clinic and Dodds. We'll call that the Jenkins estate lawsuit. Almost a year later, on June 16, 2014, Kevin Julmist, who is the father of Erica Beaubrun's two minor children, filed a lawsuit in Georgia state court against Dodds, the Clinic, and Opulence Aesthetic Medicine (the Clinic's doing-business-as name). To simplify things, we'll call that the Beaubrun estate lawsuit even though technically it is not.[1]

---

[1] Julmist filed that lawsuit not as the personal representative of Beaubrun's estate but instead as "next friend" and "natural parent" of her children. *See City of Dalton v. Cochran*, 55 S.E.2d 907, 910 (Ga. Ct. App. 1949) ("The purpose of a guardian ad litem or next friend is to furnish a person suit juris to carry on the litigation for the minor's benefit."); *see also Till v. Hartford Accident & Indem. Co.*, 124 F.2d 405, 408 (10th Cir. 1941) (explaining that unlike a guardian ad litem, who is appointed by the court, "[a] next friend is one who, without

22-10614                Opinion of the Court                3

The appeal before us involves the Beaubrun estate lawsuit indirectly, but it does not directly involve the claims that were brought in that lawsuit. Instead, it arises from the Clinic's assignment to the Beaubrun estate of some of the Clinic's claims against its insurance companies after a consent judgment in the amount of $60,000,000 was entered in favor of the Beaubrun estate and against the Clinic in the estate's lawsuit.

For purposes of the present lawsuit, which is a dispute about insurance coverage and its limits, the Beaubrun estate and the Clinic essentially became co-plaintiffs, advancing the same claims and asserting the same arguments against the insurers. When we refer to those two parties collectively, we'll simply call them the plaintiffs.

The lawsuit that arose from the death of Dodds' other patient at the Clinic (the Jenkins estate lawsuit) is only tangentially related to this appeal. That lawsuit is relevant only because of the effect it had on the aggregate amount of coverage available under the insurance policy that covered the Clinic and Dr. Dodds. (She is not a party to this appeal.) That insurance policy contained a diminishing limits provision.[2] Under that provision, the cost of

being regularly appointed guardian, represents" a plaintiff who is a minor). But referring to it as the Beaubrun estate's lawsuit does not affect any of the issues before us and links the name of the lawsuit to the decedent instead of using the different name and capacity of Julmist.

[2] Diminishing limits provisions create "an arrangement where defense expenses incurred by the insurer decrease[] the amount of liability coverage." Nicholas A. Marsh, Note, *"Bonded & Insured?": The Future of Mandatory*

22-10614                Opinion of the Court                4

defending the Clinic and Dr. Dodds from the Jenkins estate lawsuit not only diminished the $50,000 amount available for the Jenkins estate's claim to coverage, but it also diminished the total amount of coverage available under the policy, which was capped at $100,000. Likewise, under that same provision, the cost of defending the Clinic and Dr. Dodds from the Beaubrun estate lawsuit diminished the $50,000 amount available for the Beaubrun estate's claim to coverage and also diminished the $100,000 total amount of coverage available under the policy.

The bottom line for this appeal is that under the terms of the policy, the defense of the Jenkins and the Beaubrun estates' lawsuits exhausted the Clinic's insurance coverage. The policy's declarations page unambiguously specifies a $50,000 limit for any professional liability claims and a $100,000 policy aggregate limit for any and all of those claims combined. In other words, defending the Beaubrun estate lawsuit diminished the amount of coverage available for that claim, and defending both the Beaubrun and the Jenkins estates' lawsuits diminished the aggregate limit until there was no coverage left.

## I. Factual Background and Procedural History

---

*Insurance Coverage and Disclosure Rules for Kentucky Attorneys*, 92 Ky. L.J. 793, 814 (2004); *cf.* James E. Mercante, Article, *Hurricanes and Act of God: When the Best Defense Is A Good Offense*, 18 U.S.F. Mar. L.J. 1, 13 (2006) ("There are some marine policies with 'wasting' or 'diminishing' limits meaning that the liability limits are diminished by legal fees. These are not uncommon and in such a policy, as the cost of defense rises, the available funds for settlement are reduced.").

As mentioned, the Jenkins estate lawsuit was filed first. For that reason, we will first provide the highlights of its procedural history and then discuss the history of the Beaubrun estate lawsuit.

## A. The Jenkins Estate Lawsuit

The Jenkins estate lawsuit was filed in August 2013, and the Clinic's insurer, Prime Insurance Co., defended the Clinic and Dodds under a reservation of rights. A couple of months after the lawsuit was filed, David McBride, who worked for Prime, tendered a settlement offer from Prime of $50,000 to the Jenkins estate, but the estate rejected that offer.

In April 2014, the Jenkins estate demanded $100,000 from Prime, which counteroffered $39,000, an amount that was $11,000 less than it had offered through McBride earlier. The reason Prime's second offer was for only $39,000 of coverage apparently was that under the diminishing limits provision, defending the Jenkins estate lawsuit had diminished the total amount available by $11,000. The Jenkins estate rejected that offer.

On May 6, 2014, Prime notified the Clinic that the policy's Professional Liability Limit of $50,000 for a single claim had been depleted defending the Jenkins estate lawsuit. And in July 2014 a Georgia state court entered an order authorizing Prime to withdraw from representing the Clinic and Dodds in the Jenkins estate lawsuit.

Dodds was dismissed as a party, and the Jenkins estate's case proceeded to trial, during which the Clinic was not represented by

counsel.  A default judgment was entered against the Clinic, and in December 2018 a jury awarded the Jenkins estate $60,000,000 in damages.

### B. The Beaubrun Estate Lawsuit

In a letter dated June 11, 2014, Prime's counsel wrote this to counsel for the Beaubrun estate:

> As you know, I represent Prime Insurance Company which insured CLJ Healthcare with respect to the above-referenced claim [referring to a claim number]. The policy is the same policy at issue in the Jenkins v. CLJ Healthcare claim. The policy has a $50,000 professional liability limit, with a $100,000 aggregate. The aggregate has been depleted by defense of the Jenkins claim. Prime hereby tenders the $50,000 professional liability limit to your client in exchange for a release of all claims against CLJ Healthcare and its employees and agents.

 (It's not entirely clear why, if Prime had spent more than the $100,000 aggregate policy limit, it still offered the Beaubrun estate the $50,000 policy limit, but we have set out exactly what the June 11, 2014 letter said.)

The Beaubrun estate rejected Prime's $50,000 offer for two reasons.  First, the estate believed that the policy provided $100,000 in coverage, which would mean that the offer was for less than the amount of coverage available.  Second, the estate objected to the release of claims against a nurse anesthetist who allegedly failed to

properly monitor Beaubrun.    (That second objection is not involved in this lawsuit.)

After the Beaubrun estate rejected Prime's $50,000 offer, on June 16, 2014, the estate filed a Georgia state court lawsuit against Dodds, the Clinic, and Opulence Aesthetic Medicine (the Clinic's doing-business-as name).  The lawsuit claimed that Dodds was liable for professional negligence and that the Clinic and Opulence Aesthetic Medicine were liable under a theory of respondeat superior.  In the "damages," section of its complaint, the estate sought "to recover for the full value of the life of Erica Beaubrun, for her wrongful death, and all other elements of damages allowed under Georgia law."  Among other things, the estate specifically sought damages for pain and suffering and for funeral expenses.  It also sought attorney's fees and costs.  Prime defended the named defendants in that lawsuit for a period of time.

But on January 27, 2015, Prime sent Dodds and the Clinic a letter stating that "[t]he limit of insurance available through [the] policy issued by Prime is $50,000 per claim, with an aggregate limit of $100,000."  (The reference to "per claim," in context, is not to a legal claim asserted in the underlying lawsuit against the insureds but is to their claim for coverage under the policy.  There was a Jenkins "claim" and a Beaubrun "claim" for coverage.)  Prime's letter to Dodds and the Clinic stated that the $50,000 "per claim limit of liability" had already been "completely depleted" in providing a defense in the Beaubrun "matter."  It added that the $50,000 per claim limit had also been expended "in relation to the

claims of" the Jenkins estate against the defendants. The result was that the combined expenditures in defending the insureds against the two lawsuits exhausted the aggregate $100,000 policy limit. For that reason, Prime stated it was withdrawing its defense in the Beaubrun "matter."

### 1. The Utah Declaratory Judgments

On January 27, 2015, the same day that Prime sent its letter to the Clinic and Dodds telling them that the policy limits were exhausted, Prime filed a declaratory judgment action against them in state court in Utah, where Prime's principal place of business was. The action sought a judgment that:

> (a) Prime has no obligation to provide for Dr. Dodds' and/or [the Clinic's] defense in the Jenkins or Bea[u]brun claims beyond the $50,000 Professional Liability limit applicable to each of those claims.
>
> (b) Prime is entitled to withdraw its defense of Dr. Dodds and [the Clinic] in the Jenkins lawsuit inasmuch as it ha[d] incurred in excess of $50,000 in defending that matter.
>
> (c) Prime is entitled to withdraw its defense of Dr. Dodds and [the Clinic] in the Bea[u]brun claim inasmuch as it ha[d] incurred in excess of $50,000 in defending that matter.

The complaint did not seek any declaratory relief based on the aggregate policy limit provision. Instead, it relied solely on the $50,000 policy limit per claim provision and sought declaratory relief based only on that provision.

Prime served Dodds and the Clinic with the complaint in the declaratory judgment action, but neither of them filed an answer or otherwise responded. After default was entered, Prime sought a default judgment against Dodds and the Clinic on the Jenkins claim and on the Beaubrun claim. It asked the court to declare that it had no obligation to defend or indemnify Dodds and the Clinic against any claims brought by the Jenkins or the Beaubrun estates.

The Utah state court first entered an order granting default judgment against Dodds and the Clinic in regard to the Jenkins claim for coverage. That order stated that Prime had no obligation to defend or indemnify Dodds or the Clinic on the Jenkins claim beyond $50,000, and because Prime had already incurred expenses of more than $100,000 defending both the Jenkins and Beaubrun claims, it had no obligation to indemnify Dodds or the Clinic for the $60,000,000 judgment entered in the Jenkins lawsuit.[3]

In April 2019, after the Utah district court had entered the Jenkins declaratory judgment but before it entered judgment on the Beaubrun claim, the Beaubrun estate submitted to Prime a demand for $100,000 to settle the Beaubrun claim and release

---

[3] It is unclear why the Utah state court granted Prime declaratory relief on the $100,000 aggregate limits provision as well as on the $50,000 policy limit per claim provision when Prime requested relief only on the $50,000 policy limit per claim provision. In any event, it does not matter because, as we will explain later, the declaratory judgment granted by the Utah state court does not affect our analysis.

Dodds and the Clinic.  The next month Prime responded that based on the policy limits, there was no remaining coverage.

A few of months after that, in July 2019, the Utah state court entered an order granting Prime's motion for default judgment against Dodds and the Clinic on the Beaubrun claim.  The order stated that Prime had no obligation to defend Dodds or the Clinic "in the Bea[u]brun claim beyond the $50,000 Professional Liability limit applicable to that claim."  It also stated: "[i]nasmuch as Prime incurred in excess of $50,000 in defending the Bea[u]brun claim, and also incurred in excess of $100,000 total in defending the Jenkins and Bea[u]brun claims, it has no further obligation to defend [the Clinic] or Dr. Dodds in the Bea[u]brun lawsuit."

About two weeks after that, on July 31, 2019, Prime filed in Georgia state court a notice and a petition seeking to domesticate the Utah judgment against Dodds and the Clinic.  On September 16, 2019, the Georgia state court entered an order domesticating that judgment.  The order declared that (1) beyond the $50,000 professional liability limit, Prime had no obligation to defend or indemnify Dodds or the Clinic against the Beaubrun claim; (2) it had no obligations under the policy once the $100,000 aggregate limit had been exhausted; and (3) it had no obligation for the Beaubrun "judgment" because it had spent more than $50,000

defending the Jenkins claim and more than $100,000 total defending the Jenkins and Beaubrun claims.[4]

### 2. Judgment in the Beaubrun Estate Lawsuit

On January 22, 2020, with the parties' consent, the Georgia state court ordered Dodds' dismissal in the Beaubrun estate's lawsuit that was pending there. And on February 13, 2020, a consent judgment in the amount of $60,000,000 was entered in favor of the Beaubrun estate and against the Clinic in that lawsuit.

### C. The Parties in the Present Lawsuit

To recap, the plaintiffs in the present lawsuit are the Beaubrun estate and the Clinic. And the defendants are Prime Insurance Co., Prime Holdings Insurance Services, Inc. (d/b/a Claims Direct Access), and Evolution Insurance Brokers, LC (collectively, the insurers). Prime issued the insurance policy to the Clinic; Prime Holdings (Claims Direct) is a related entity; Evolution is the broker that sold that policy to the Clinic.

Claims Direct's employee David McBride allegedly advised the Clinic during the defense of the Beaubrun lawsuit. The complaint describes McBride as "an adjuster acting on behalf of Claims Direct." In their brief to this Court, the insurers describe him as Claims Direct's Senior Vice President and Corporate Attorney. But McBride was not named as a defendant.

---

[4] The order referred to the Beaubrun "judgment," even though the consent judgment in the Beaubrun estate lawsuit wasn't entered until after the Utah declaratory judgment and the Georgia state court order domesticating it.

D. The Claims in the Present Lawsuit

In their complaint, the Beaubrun estate and the Clinic asserted the following claims against the defendants: Count 1 breach of duty against Claims Direct; Count 2 breach of contract against Prime; Count 3 negligence against Prime and Claims Direct; (the complaint has no Count 4); and Count 5 unauthorized sale of surplus lines insurance against Prime and Evolution. Counts 6 and 7 sought punitive damages and attorney's fees against all the defendants.

Count 1, the breach of duty claim against Claims Direct, alleged that McBride had held himself out as protecting the Clinic's interests when he was actually protecting Prime's interests. The specific allegations were that McBride breached a duty by failing to pass along to Prime the Beaubrun estate's $100,000 settlement demand, and that he also assisted Prime during the Utah declaratory judgment proceedings by signing an affidavit for it stating that the policy limits were exhausted.

Count two, the breach of contract claim against Prime, alleged that it had breached the policy by asserting that the limit for defending the Beaubrun claim was $50,000 instead of $100,000 and by asserting that the limit had been exhausted. Count three alleged that Prime was negligent in refusing the Beaubrun estate's demand for $100,000 and that Prime and Claims Direct were negligent by not informing the Clinic of that demand. Count five, the unauthorized sale of surplus lines insurance claim against Prime and Evolution, alleged that the sale of the policy was

unauthorized in Georgia because, among other things, it did not include the "standard" surplus lines disclosure.

The insurers removed the case to federal district court where they moved to dismiss the complaint. The court granted that motion.

The district court decided that counts one, two, and three (the breach of duty, breach of contract, and negligence claims) all failed because they relied on an incorrect interpretation of the policy's limits, and the Utah default judgment collaterally estopped litigation of whether the policy had a $100,000 limit for the Beaubrun claim. The court also decided that the count one breach of duty claim was barred by a four-year statute of limitations. It dismissed count five after determining that the Georgia Surplus Lines Insurance Act does not provide a private cause of action. Finally, the court decided that the derivative claims for punitive damages and attorney's fees failed because the substantive claims on which they were based failed.

The Beaubrun estate and the Clinic appeal the judgment dismissing their complaint.

## II.     Standard of Review

We review *de novo* the grant of a motion to dismiss, accepting the factual allegations in the complaint as true and construing them in the light most favorable to the non-movants. *Bourff v. Rubin Lublin, LLC*, 674 F.3d 1238, 1240 (11th Cir. 2012). The district court considered the insurance policy that the insurers

22-10614            Opinion of the Court            14

attached to their motion to dismiss without converting their motion into one for summary judgment. That was appropriate because the policy is "(1) central to [the Beaubrun estate's and the Clinic's] claim[s] and (2) undisputed," meaning that "the authenticity of the document is not challenged." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). "Because insurance policies are considered contracts, interpretation of insurance policy language is also a matter of law, subject to *de novo* review." *Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1219 (11th Cir. 2015) (cleaned up).

## III.    Discussion

As we've noted, Prime's principal place of business is in Utah. Prime sold the policy to the Clinic through Evolution Insurance Brokers. Evolution is organized under the laws of Utah. The Clinic is located in Georgia. The fact that Prime and Evolution are out-of-state insurers matters here because the Clinic purchased a surplus lines policy from them.

### A.  The Policy

The insurance policy that covered the Clinic and Dr. Dodds is a surplus lines policy. Surplus line insurers are authorized to sell insurance in Georgia so long as they comply with certain requirements, including selling the insurance through a licensed surplus lines broker.[5] *See Kay-Lex Co. v. Essex Ins. Co.*, 649 S.E.2d 602, 609 (Ga. Ct. App. 2007).

---

[5] The Georgia Code defines surplus line insurance as "any property and casualty insurance permitted in a state to be placed through a surplus line

According to the plaintiffs, Evolution was not licensed as a surplus lines insurance broker in Georgia, and the policy did not include the standard disclosure that Georgia law requires for surplus lines policies. *See* Ga. Code § 33-5-20.1(8) (defining a surplus lines broker as "an individual who is licensed in this state to sell, solicit, or negotiate insurance on properties, risks, or exposures located or to be performed in this state with nonadmitted insurers"); *see also id.* § 33-5-26 (requiring disclosures for surplus lines policies).

The coverage period of the policy that Prime issued to the Clinic and Dodds was December 22, 2012 to December 22, 2013, and the premium was $3,991.52. The declarations page lists "$100,000 Policy Aggregate" and "$50,000 Professional Liability." It is a healthcare services professional liability policy providing coverage for "Wrongful Acts relating to the providing of Your Services."

The Limits of Liability section in the policy states that "[e]ach Wrongful Act Limit of Liability listed on the Declarations is the most we will pay for any combination of Damages and/or Claim Expenses because of all Damages arising or allegedly arising

---

broker with a nonadmitted insurer eligible to accept such insurance." Ga. Code § 33-5-20.1(7). The governing regulations describe it as "a policy placed with an insurer that is not licensed (or 'admitted') in [Georgia], but is nonetheless eligible to provide insurance on property or liability insurance protection to citizens of [Georgia] through specially licensed agents or brokers known as surplus lines brokers." Ga. Comp. R. & Regs. 120-2-89 app. A.

out of any one Wrongful Act."  The policy also caps payouts on multiple claims against the insured in this way:

> Multiple Claims by one or more parties arising out of a single Wrongful Act or series of related Wrongful Acts resulting in, or allegedly resulting in, Damages suffered by a single resident at an Insured's facility or under the Insured's care, shall be considered a single Claim for purposes of this Policy, and as a single Claim shall be subject to the Limit of Liability listed on the Declarations for a single Claim.

The policy provides: "A single Wrongful Act, or the accumulation of more than one Wrongful Act during the Policy Period, may cause the per event limit and/or the annual aggregate maximum limit to be exhausted at which time the Insured will have no further benefits under the Policy."  And "[n]otwithstanding anything contained in this Policy to the contrary, the Insurer's financial obligation imposed by the coverage with respect to all Claims hereunder shall not exceed the amount specified on the Declarations as the aggregate Limit of Liability."  That's a $100,000 cap on coverage for "all Claims."

The policy gives Prime "both the right and the duty to provide for [the Insured's] defense with respect to a Claim covered by the Policy."  But Prime's duty to defend its Insured ends "[w]hen the applicable Limits of Liability of the Policy are exhausted by payment of Damages and/or Claim Expenses."

Then there's the diminishing limits feature of the policy. *See* supra n.2. According to the policy's plain terms, claim expenses

come out of the policy's limits.  The policy defines "Claim Expenses" to include "[a]ll fees, costs, and expenses charged by any lawyer or other service provider designated by the Insurer to represent the Insured" and "[a]ll other fees, costs, and expenses . . . resulting from the investigation, adjustment, defense, and appeal of a Claim." It sets the "Limit(s) of Liability" as the "maximum amount the Insurer will be obligated to pay for an otherwise covered Claim, including payment for Claim Expenses, Damages, or any other sums due under this Policy, the amount of which is set forth on the Declarations." And "[a]ll Claim Expenses reduce the available Policy Limits."

## B.  Count One: Statute of Limitations on the Breach of Duty Claim

Count one alleges that Claims Direct breached a duty to the Clinic.  The district concluded that the claim was barred by the statute of limitations.

### 1. The Alleged Duty

The complaint itself doesn't name the duty to the Clinic that Claims Direct allegedly breached.  In their brief to us the plaintiffs say it was the breach of a fiduciary duty.  And the factual allegations of the complaint focus on the advice that was given (or allegedly should have been but was not given) to the Clinic by Claims Direct's employee McBride (who is not named as a defendant).

The complaint alleges that McBride failed to communicate to the Clinic an April 26, 2019 settlement offer from the Beaubrun estate.  He was allegedly protecting the insurers' interests while

giving advice that made the Clinic believe he was protecting its interests. And McBride allegedly did not explain to the Clinic that defending the Beaubrun lawsuit would cost more than $50,000, which was the policy limit for the claim. Finally, in the Utah declaratory judgment action, he assisted Prime's lawyers. He allegedly did so "through signing an affidavit for use in support of Prime's contention that the available policy limits were exhausted." According to the complaint, "McBride, as an agent for Claims Direct Access, filed an affidavit regarding the amount of attorney[']s fees and expenses incurred in its 'defense' of the *Beaubrun* matter."

The district court determined that the Georgia four-year statute of limitations for breach of fiduciary duty or legal malpractice applied, not Georgia's six-year statute of limitations for breach of contract.[6] It then concluded that McBride's alleged actions and inaction that were the basis for this claim occurred outside of that four-year period.

The plaintiffs contend that Georgia's six-year statute of limitations for breach of contract should apply to this claim. They now specify that while the claim is one for breach of fiduciary duty "the underlying conduct" for the claim is a breach of contract, so

---

[6] In their briefs to this Court, the parties accept the district court's position that Georgia law applies, and each cites decisions of that state's courts on the statute of limitations issue relating to the breach of duty claim. We will accept their implicit agreement that Georgia law applies to the issue without deciding whether they are both right (or both wrong) about choice of law.

the six-year statute of limitations should apply. And they argue that there was a continuing series of breaches based on McBride's conduct.

The Georgia statute of limitations for breach of "simple contracts in writing" is six years. Ga. Code § 9-3-24. That six-year limit also applies when "an implied promise to perform professionally pursuant to a written agreement for professional services" is written into a contract by law and that promise is broken. *Newell Recycling of Atlanta, Inc. v. Jordan Jones & Goulding, Inc.*, 703 S.E.2d 323, 325 (2010).

A four-year limitations period "applies where no sufficiently written contract exists and a cause of action can therefore be based solely on the breach of an express oral or implied promise." *Id.* (citing the four-year limitations period in Ga. Code § 9–3–25, which applies to the breach of "any implied promise or undertaking"). Then there's the hybrid situation where a written contract exists, and a party to it alleges that implied duties were breached. *See Newell Recycling,* 703 S.E.2d at 325. To determine whether the six-year period applies in a hybrid situation, courts must look to whether "any implied duties" that were allegedly breached "would have *grown directly* out of the existence of the written contract itself." *Id.* (emphasis added).

The district court determined that the insurance policy was not a "complete written agreement for professional services." It observed that the policy did not assign any specific responsibilities to Claims Direct or its employee McBride for defending the insured

or counseling the insured about mounting a defense. The court reasoned that McBride's actions "cannot reasonably be understood as services that were directly contemplated in and arose out of the Policy." Instead, his alleged actions were incidental to the policy and reflect asserted failures to provide what amounted to "legal or business advice." In the court's view, that means whatever advice McBride provided or failed to provide, his professional services did not "grow immediately out of the Policy" and the insurer's obligations under the terms of that contract.

We agree that if there was a duty that McBride's actions or omissions breached, it did not "grow out of" the written contract. *See* Ga. Code Ann. § 9-3-24; *Newell Recycling of Atlanta*, 703 S.E.2d at 325. The contract was an insurance policy, not a contract for professional services. And the six-year statute of limitations for breach of contract found in Ga. Code Ann. § 9-3-24 refers only to "liabilities resting in or growing out of written contracts, not remotely or ultimately, but immediately." *Newell Recycling of Atlanta*, 703 S.E.2d at 325 (quotation marks omitted).

At most, McBride's alleged breaches are of a fiduciary duty that is incidental to the policy. Any obligations he had to provide advice or guidance or to provide those services in a certain manner did not "grow[] . . . immediately" out of the policy. *Id.* (quotation marks omitted). The district court correctly concluded that a four-year statute of limitations applies to the breach of fiduciary duty claim.

### 2. When the Claim Accrued

The next step is determining whether the claim accrued outside of the four-year statute of limitations period. Under Georgia law, "[t]he statute of limitation for a cause of action for breach of fiduciary duty is triggered by a wrongful act accompanied by any appreciable damage." *Hendry v. Wells*, 286 Ga. App. 774, 779, 650 S.E.2d 338, 343 (2007). And Georgia courts have rejected the "continuing tort theory" for breach of fiduciary duty claims. *See Corp. of Mercer Univ. v. Nat'l Gypsum Co.*, 368 S.E.2d 732, 733 (Ga. 1988) (stating that "[t]he continuing tort theory . . . is limited to cases in which personal injury is involved"); *Allen v. Columbus Bank & Tr. Co.*, 534 S.E.2d 917, 921 (Ga. Ct. App. 2000) (rejecting an argument that the mismanagement of a trust is a continuing tort "inasmuch as the [Georgia] Supreme Court has ruled that the continuing tort theory is applicable only to cases involving personal injury").

The district court determined that the earliest alleged breach of duty arose from "McBride's advice or counsel—or lack thereof," which occurred *before* the Beaubrun estate's state court lawsuit was filed on June 16, 2014. McBride's actions, or inaction, and Claims Direct's and McBride's alleged breaches related to their assistance with the Utah declaratory judgment action in 2015, all occurred more than four years before the present lawsuit was filed on March 12, 2021. So the statute of limitations barred the breach of duty claim.

The plaintiffs point to McBride's alleged conduct in 2019. They assert that he failed to pass along to the Clinic an April 2019

settlement demand for $100,000 from the Beaubrun estate, and that the same year he signed an affidavit that Prime could use in the Utah declaratory judgment action to establish that the policy limits had been exhausted.

It is true that "each act of alleged breach of fiduciary duty that causes damage creates a new cause of action for that specific act." *Godwin v. Mizpah Farms, LLLP*, 766 S.E.2d 497, 505 (Ga. Ct. App. 2014). But McBride's alleged failure to convey to Prime the Beaubrun estate's $100,000 settlement demand in 2019 was directly related to the settlement negotiations in 2014 and the filing of the declaratory judgment action in 2015, which were outside the four-year statute of limitations. The Beaubrun estate's 2019 demand for $100,000 and Prime's rejection of it were a continuation of the estate's June 2014 rejection of the $50,000 tender and its insistence that the policy provided $100,000 in coverage for the Beaubrun claim. Any refusal to provide $100,000 or pass along information relating to that demand is the same allegedly wrongful act and not a new, separate basis for a claim in 2019.

As we mentioned, the Georgia Supreme Court has limited any "continuing tort theory" to personal injury claims, s*ee Corp. of Mercer Univ.*, 368 S.E.2d at 733, and a breach of fiduciary duty claim that occurs outside the statute of limitations cannot be revived by asserting that it based on "continuing" conduct. If there is a new and distinct breach of duty, that may start the limitations clock running anew, *see Godwin*, 766 S.E.2d at 505, but that isn't what the plaintiffs have alleged.

Instead, they've alleged a breach of duty that had two components. The first involved the June 2014 refusal to settle with the Beaubrun estate for the aggregate limit of the Clinic's policy ($100,000). The second component was McBride's supplying an affidavit in the Utah declaratory judgment action in 2019 stating that the policy limits had been exhausted.

The alleged breach that is the second component is a continuation of the alleged breach that is first component. Providing an affidavit supporting a paid-out defense that has already been asserted is not materially different for these purposes from seeking a declaratory judgment that policy proceeds have been fully paid out. The time for filing the breach of fiduciary duty claim began to run when the 2015 declaratory judgment action was filed, which was more than four years before the plaintiffs filed the present lawsuit in 2021.

It follows that the district court correctly dismissed the count one breach of fiduciary duty claim as barred by the four-year statute limitations. *See Gonsalvez v. Celebrity Cruises Inc.*, 750 F.3d 1195, 1197 (11th Cir. 2013) ("A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate if it is apparent from the face of the complaint that the claim is time-barred.") (quotation marks omitted).

C. Counts Two and Three: the Utah Declaratory Judgment and the Claims Dependent on the Policy Limit

Count two alleges that Prime breached the policy by failing to provide $100,000 in coverage. Count three alleges that Claims

Direct and Prime negligently failed to accept a demand for $100,000, offering only $50,000.

Those two counts hinge on whether the policy provided a $100,000 or a $50,000 limit for the Beaubrun claim. The district court dismissed them after determining that the plaintiffs were collaterally estopped from contending that the policy has a $100,000 limit for the Beaubrun claim, after that issue was fully litigated and decided in favor of the defendants in the Utah declaratory judgment action.[7] That judgment, and the Georgia one domesticating it, declare that the professional liability limit for the Beaubrun claim was $50,000 and that because that limit had been exceeded, Prime had no further obligation to defend or indemnify the Clinic or Dodds against the Beaubrun claim.

### 1. The Policy Limits

It doesn't matter whether collateral estoppel applies to the policy limits issue underlying the claims in counts two and three because those claims are foreclosed by the plain language of the policy anyway. For that reason, we need not and do not address collateral estoppel.

The policy provides: "This Agreement is entered into in the State of Utah and the Agreement, and any rights, remedies, or obligations provided for in this Agreement, shall be construed and

---

[7] The court also determined that the count one claim for breach of fiduciary duty was subject to collateral estoppel for the same reason. Because we've concluded that count one is barred by the four-year statute of limitations, we do not address the collateral estoppel as to it either.

22-10614                 Opinion of the Court                 25

enforced in accordance with the laws of Utah."[8]    Utah courts interpret insurance policies as they do other contracts: "if the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language." *Benjamin v. Amica Mut. Ins. Co.*, 140 P.3d 1210, 1213 (Utah 2006) (quotation marks omitted).  Under Utah law, policy terms are given their "usually accepted meanings" and are construed "in light of the insurance policy as a whole." *Utah Farm Bureau Ins. Co. v. Crook*, 980 P.2d 685, 686 (Utah 1999).  "Policy terms are harmonized with the policy as a whole, and all provisions should be given effect if possible." *Id.*

The Prime policy language is unambiguous.    In its Declarations section under a heading titled "Professional Liability" the policy states: "$100,000 Policy Aggregate" and "$50,000 Professional Liability."    And in the Limits of Liability section the policy states that:

> Each Wrongful Act Limit of Liability listed on the Declarations is the *most we will pay* for any combination of Damages and/or Claim Expenses because of all Damages arising or allegedly arising *out of any one Wrongful Act*.  Multiple Claims by one or more parties arising out of a single Wrongful Act or

---

[8] Although the parties agreed that Georgia law applied to determine the statute of limitations for the breach of duty claim, *see supra* n.6, they don't say whether they think Utah law or Georgia law should apply to construction of the terms of the policy.  Because the policy clearly states that Utah law governs construction of its terms, and neither party suggests it should not, we will apply it in interpreting the terms of the policy.

> series of related Wrongful Acts resulting in, or
> allegedly resulting in, Damages suffered by a single
> resident at an Insured's facility or under the Insured's
> care, shall be considered a single Claim for purposes
> of this Policy, and as a single Claim shall be subject to
> the Limit of Liability listed on the Declarations for a
> single Claim.

The Beaubrun estate's claim, which stems from Erica Beaubrun's death following a liposuction procedure at the Clinic, is a single claim under the Policy. That means it is subject to the $50,000 limit of liability.

### 2. The Expert's Affidavit

We are unpersuaded by the plaintiffs' attempt to redirect our attention to an affidavit they obtained from a lawyer who is an author of insurance treatises, in which he purports to enlighten us on why the policy's limit provisions should be construed in the plaintiffs' favor. In Utah the interpretation of an insurance policy is a question of law. *Mellor v. Wasatch Crest Mut. Ins. Co.*, 201 P.3d 1004, 1007 (Utah 2009). The same is true in Georgia. *See, e.g.*, *Magnetic Resonance Plus, Inc. v. Imaging Sys. Int'l*, 543 S.E.2d 32, 34 (Ga. 2001) (quoting Ga. Code Ann. § 13–2–1). And probably in every other state too.

We have repeatedly said, in a number of contexts, that we do not need, want, or accept expert testimony on questions of law. *See, e.g.*, *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1128–29 (11th Cir. 2018) ("[Q]uestions of law are not subject to expert

22-10614                Opinion of the Court                27

testimony."); *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (explaining that questions of law, like whether a use of force is excessive, are not subject to expert testimony); *Newland v. Hall*, 527 F.3d 1162, 1208 (11th Cir. 2008) (explaining that when determining the reasonableness of an attorney's conduct, "statements from other attorneys are not dispositive; indeed, they have little weight in our analysis."); *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) ("[I]t would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable. The question is not one to be decided by plebiscite, by affidavits, by deposition, or by live testimony. It is a question of law to be decided by the state courts, by the district court, and by this Court, each in its own turn."); *see also Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990).[9]

---

[9] In the land of the law, it seems, there is always an exception or two to nearly every rule, no matter how emphatically the rule is stated or how close to universally it applies. So it is here. The exception is that expert testimony on *foreign* law is permitted. *See Pierce v. Indseth,* 106 U.S. 546, 551 (1883) ("The general rule as to the proof of foreign laws is that . . . unwritten law must be proved by the testimony of experts, that is, by those acquainted with the law."); *Baloco ex rel. Tapia v. Drummond Co.,* 640 F.3d 1338, 1349 (11th Cir. 2011) (relying on expert testimony to interpret Columbian law); *Ramsay v. Boeing Co.,* 432 F.2d 592, 599–602 (5th Cir. 1970) (relying on expert testimony to interpret Belgian law); *Shapleigh v. Mier*, 83 F.2d 673, 676 (5th Cir. 1936) ("The law of Mexico . . . remains foreign law to be proven as a fact when written by production of copies of the Constitution and statutes, *and in other respects by the testimony of experts*.") (emphasis added), *aff'd*, 299 U.S. 468 (1937). But neither Georgia nor Utah law is the law of a foreign state.

Every federal judge takes an oath of office swearing to "administer justice . . . and . . . faithfully and impartially discharge and perform all the duties" of a judge "under the Constitution and laws of the United States." 28 U.S.C. § 453. And under the Constitution, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). We will not cede that province or delegate our duty to say what the law is to non-judges with opinions that can be called forth for hire.

Because we interpret the plain language of the insurance policy to mean that the policy limit is $50,000 for a claim of professional liability, the Beaubrun estate's argument to the contrary fails. And counts two and three of the complaint fail with it.

### D.  Count Five: Georgia Surplus Lines Insurance Claim

The district court also dismissed count five, which is a claim against Prime and Evolution for the unauthorized sale of surplus lines insurance. The court concluded the Georgia Surplus Lines Insurance Act (GSLIA) provides no private cause of action. It also determined that the claim had been abandoned because the plaintiffs did not respond to the insurers' argument that the GSLIA does not provide a private cause of action.

Section 33-5-26(b) of the GSLIA states that "[n]o surplus lines policy or certificate . . . shall be delivered in this state unless a standard disclosure form or brochure explaining surplus lines insurance is attached to or made a part of the policy or certificate."

Ga. Code Ann. § 33-5-26(b).  Georgia Rules and Regulations 120-2-89 provides that "[a]ny insurer or surplus lines broker failing to comply with the requirements of this Regulation Chapter shall be subject to such penalties as may be appropriate under the insurance laws of this State."  Ga. Comp. R. & Regs. 120-2-89-.04.

The plaintiffs allege that the policy did not have the required disclosure and assert that the lack of this disclosure enabled Evolution and Prime to "exploit internal ambiguities within the Policy to their advantage," and that the Clinic has "sustained damages" (in the form of the $60,000,000 consent judgment) "resulting from the substandard policy of insurance."  They also assert that Evolution was not authorized to sell insurance in Georgia.

The insurers contend that the GSLIA does not provide a private cause of action. The plaintiffs failed to address that contention in the district court, and they don't address it in their briefs to this Court.  Instead, they contend only that the "regulating of insurers and the requirement that insurers and/or insurance brokers be licensed in Georgia to transact insurance business is a long-standing policy decision of our state."  They argue that because the State of Georgia has not "taken any corrective or disciplinary action" against the defendants, we should engraft a private cause of action onto the GSLIA in order to serve "public policy."  But they point to no authority supporting a private cause of action for failing to comply with the GSLIA's disclosure requirements.

The insurers respond that Georgia law does not provide a private cause of action and that, even if it did, it would not result in unlimited liability coverage. Instead, they note that even if the policy did not contain a disclosure,[10] the sole remedy for that failure would be a penalty imposed by the Georgia Insurance Commissioner. *See* Ga. Comp. R. & Regs. 120-2-89-.04; *cf. Tyson v. Scottsdale Indem. Co.*, 805 S.E.2d 138, 143 (Ga. Ct. App. 2017) (finding no support for the assertion that "an insurer's failure to comply with [the surplus lines insurance statutes] renders a policy unenforceable"). The insurers also argue that the Clinic's liability for a $60,000,000 consent judgment "has nothing to do with" whether the policy had the proper surplus lines disclosure.

The district court was correct to dismiss count five. Georgia law provides no private cause of action for the unauthorized sale of surplus lines insurance. And we are not in the business of engrafting additional remedy provisions onto state (or federal for

---

[10] The policy contains a disclosure page about its status as a surplus lines policy. At oral argument, counsel for the insurers pointed out that the policy did contain a surplus lines disclosure, but conceded that the disclosure in the Policy did not exactly track the language in Ga. Comp. R. & Regs. 120-2-89 app. A, as required by that section. *See* Ga. Comp. R. & Regs. 120-2-89-.03(a). But, as counsel correctly stated, the proper remedy for failing to comply with that section comes in the form of penalties from the Georgia Insurance Commissioner, not a judicially imposed private cause of action. *See* Ga. Comp. R. & Regs. 120-2-89-.04.

22-10614                Opinion of the Court                31

that matter) statutes.  As written, the GSLIA provides the plaintiffs no relief.[11]

**AFFIRMED.**

---

[11] In counts six and seven of the complaint, the plaintiffs seek punitive damages and attorney's fees, but because all their substantive claims fail, they have no basis for that relief, and the district court correctly dismissed those counts. (As mentioned before, the complaint contained no count four.)